# United States Court of Appeals
## For the First Circuit

No. 04-1293

UNITED STATES OF AMERICA,

Appellee,

v.

JOSHUA BEZANSON-PERKINS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

Paul Garrity for appellant.
Donald A. Feith, Assistant United States Attorney, with whom
Thomas P. Colantuono, United States Attorney, was on brief for
appellee.

November 23, 2004

**LYNCH**, **Circuit Judge**.    Joshua Bezanson-Perkins pled guilty to one count of aiding and abetting a bank robbery in violation of 18 U.S.C. §§ 2 and 2113(a).  He entered his plea after the district court denied his motion to suppress his confession. His plea bargain expressly reserved the right to appeal the court's suppression order, which he does here.

The theory presented is an unusual one: that a defendant who has given a valid Miranda waiver may seek to suppress his later voluntary and uncoerced statements to the police on the grounds that (arguably) misleading statements by the police invalidated his Miranda waiver.  On the facts, we reject this theory and affirm.

**I.**

On the afternoon of September 5, 2002, a man armed with what appeared to be a handgun robbed the Citizen's Bank in Hooksett, New Hampshire.  After the robber left the bank, he was seen by two customers as he ran toward a car, a white Geo Storm, leaned into the vehicle to speak with the driver, and then ran off. One customer wrote down the car's license plate number and then watched the Geo Storm drive across the street and park at a Dunkin' Donuts.  The driver got out and went into the Dunkin' Donuts. Police arrested the driver of the car, who was the defendant Bezanson-Perkins.

Bezanson-Perkins was taken to the Hooksett Police Station.  He was interviewed by two police officers, Detective Owen

Gaskell and Bow Police Chief Rod Forey.  Bezanson-Perkins consented to having the interview recorded, after which he was read his <u>Miranda</u> rights and given a form which he initialed and signed indicating he understood those rights.  <u>See</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966) (holding that certain warnings must be given before a suspect's statements made during custodial interrogation may be admitted in evidence).

After being told of his right to a lawyer, and that if he could not afford a lawyer one would be appointed for him, but before signing his waiver form, Bezanson-Perkins asked: "It's not going to happen right now[?]"  Gaskell replied:

> No, we don't have [a lawyer] right now.  We don't have one sitting there.  If you, you can refuse to answer any questions or stop giving this statement at any time you wish, which means that if you decide that at some point you want to stop, you stop and we won't do it any further.

Bezanson-Perkins then replied: "Okay."  He then stated that he understood his rights and agreed to waive them and talk to the officers.  Bezanson-Perkins concedes that his waiver at this time was valid.

After executing his waiver form, Bezanson-Perkins then had the following exchange with the officers:

> JBP:  <u>So if I requested a lawyer, there would be one that would come right now?</u>
>
> OG:  <u>No.</u>

-3-

RF:    Well what we'd do is if you didn't want to answer a question, you don't answer the question.

OG:    Ah go ahead and explain it to him if you want, whatever um,

RF:    Yeah I mean, the bottom-line Josh, you already told me you know the system. You've been through the system. <u>You have a right to an attorney if you want. You'd have to hire your own lawyer.</u> We'd like to ask you some questions. And actually we just want to get your version of what happened. Your involvement, you, you're telling me, you mentioned something before Detective Gaskell got in here that you know, you['re] a convicted felon and you['re] in a white car and you're at the wrong place at the wrong time, well that's what we want to talk about. We want to get your version. <u>If we have a question that you don't want to answer, say I don't want to answer that. It's as simple as that.</u>

JBP:    Okay.

The statement "You'd have to hire your own lawyer" is grist for his later argument.

        After this exchange, the officers began to question Bezanson-Perkins about the bank robbery. At the beginning of the interrogation, Bezanson-Perkins maintained that he did not know anything about the bank robbery. The police then told Bezanson-Perkins some of the evidence they were going to examine to see if that was true, such as checking his car to see if the actual robber's prints were on it, and viewing videos from the bank.

-4-

Bezanson-Perkins responded by saying that regardless of whether he was involved or not, he was going to get convicted:

> I'm gonna have to go to trial, because I know you're not gonna let me go. I'm not . . . stupid. You know. I know I'm not going home. [I'm] gonna have to take the trial or take a plea bargain. A plea bargain says oh, well if you just say you did it, then you can go home a little bit earlier. So I'll only do . . . five more years, but if I don't say I did it, then I'll probably go to trial, all the . . . jurors are just gonna sit there, twiddle their thumbs, not listen to anything I said and . . . give me seven and a half to fifteen. You think I am a . . . retard? I know I ain't going home for a long . . . time!

Detective Forey, in turn, then asked: "[I]f you know that, why you telling me the story?" He told Bezanson-Perkins that there was a difference in culpability between someone who is merely the driver in a robbery, and someone who actually commits the robbery. He also told Bezanson-Perkins that they had a lot of evidence against him that led to his arrest. When Bezanson-Perkins asked how that happened, Forey said: "How about a plate number. How about witnesses. How about driving around the bank. How about going the other way. How about you pick the bank that there happen[ed] to be a state trooper sitting having a coffee behind in the field."

Defendant also objects to certain police statements about the truth helping him, which were made in the context described above. Forey next told Bezanson-Perkins the situation as the police saw it:

If you're the wheel man and the guy that went in and pointed the gun at all those people with all those cameras going on. Drop[ped] the clip and did everything you shouldn't do in a bank robbery. If you're that guy, you may be [in serious trouble]. So do you think you[r] buddy that's all muddy now from running through and getting tracked down by the dogs, that you know is sitting down there, do you think he's gonna tell us what happened? Because that was like, well my daughter gets caught with her hand in the . . . cookie jar. I mean his is a done deal. <u>Do you want to help yourself out? That's entirely up to you.</u> We're not, the old days when we used to beat people up and take their lunch money is long over, but . . . it's up to you. You know what happened. We know what happened, <u>but you need to either come to the plate and say you know what Rob, I was the wheelman and I didn't go in the bank. That puts you in a whole different situation and when we talk to your PPO, and when we talk to the dist, the county attorney, there is a different scenario here and you know it.</u> You know it. You know the guys that go into state prison and do short time, easy time and you['re] right, two, two and a half years. You could do, you could do that standing on your freaking head.

About an hour into the interrogation, Officer Gaskell again explained the situation to Bezanson-Perkins:

If I had the powers to work things and [make] deals I would believe me. I wish I [could] cuz it would make my job so much easier. To sit there and you've already said it, <u>you can help yourself or attempt to help yourself by whatever you say and you give us to at whatever level. I can't tell you how much that will help you but there's the bottom line.</u>

Also near the end of the first round of questioning, Forey told Bezanson-Perkins that "[t]he truth opens doors," and that "<u>the</u>

truth from you is what I need.  And if I have that then I can run and then do what I can to help you." Later on, Forey stated:

> You know and I know whether you like it or not or whether you agree with it or not, the truth does help and it is going to help you in the long run and if your ultimate goal is to get back -- as soon as possible, the only thing that's going to help you is the truth.

These statements form the last prong of defendant's argument. Bezanson-Perkins continued to say that he could not tell the officers anything about the robbery, and they ended the first round of questioning.

After the first round of questioning, Bezanson-Perkins was booked and made a telephone call to his mother.  About two and a half hours after the previous interrogation ended, the officers began interviewing Bezanson-Perkins again.  They did not reread him his Miranda warnings, although they did advise him that he continued to have his constitutional rights. Bezanson-Perkins stated he understood, then confessed to the crime.  That confession is the subject of the motion to suppress.

## II.

On November 7, 2002, Bezanson-Perkins was indicted on one count of aiding and abetting a bank robbery in violation of 18 U.S.C. §§ 2 and 2113(a).  Bezanson-Perkins subsequently moved to suppress his confession.  The parties agreed not to have a hearing on the issue, as the entire interrogation had been tape recorded and the tape was admitted into evidence.  Bezanson-Perkins first

argued that the officers undermined his <u>Miranda</u> waiver of his right to counsel by falsely telling him, in the first interrogation session after he had signed the waiver form, "You'd have to hire your own lawyer." Further, he argued that the police undermined his <u>Miranda</u> waiver of his right not to incriminate himself by repeatedly telling him that the truth would help him. Finally, he argued to the district court that these deceptive statements rendered his confession involuntarily coerced.

On September 26, 2003, the district court denied the motion to suppress the confession. The district court held that defendant was properly read his <u>Miranda</u> rights and executed a knowing, intelligent, and voluntary waiver of those rights prior to any custodial interrogation. Further, the court held that Forey's post-waiver statement that "[y]ou'd have to hire your own lawyer," was not erroneous but incomplete. The court stated that it was true that if the defendant wanted the lawyer of his choice (his "own lawyer"), he would have to hire that lawyer. The court held that Bezanson-Perkins was told, and understood, that if he could not hire his own lawyer, one would be provided for him. The court also found that Bezanson-Perkins never invoked his right to counsel during the interrogation. Finally, the court held that the interviewing tactics employed by the officers did not rise to the level of coercion.

Bezanson-Perkins appeals only the first ruling of the district court.  He argues that his earlier valid <u>Miranda</u> waiver was retroactively invalidated by the officers' subsequent statements that Bezanson-Perkins would need to "hire [his] own lawyer" and that the truth would help him.  Further, he raised for the first time on this appeal the claim that certain enhancements to his sentence based on findings by the district judge violated his right to a jury trial as stated in <u>Blakely</u> v. <u>Washington</u>, 124 S. Ct. 2531 (2004).

**III.**

Bezanson-Perkins frames his argument in terms of <u>Miranda</u> rights.  <u>Miranda</u> established a baseline rule, now determined to be of constitutional dimension, as to certain warnings[1] which must be given before a suspect's custodial statements may be admitted into evidence.  <u>Dickerson</u> v. <u>United States</u>, 530 U.S. 428, 439-40 (2000).

The issue before us is a narrow one.  Bezanson-Perkins does not appeal the district court's ruling that his confession was not coerced by the officers.  Further, Bezanson-Perkins does not contend that, after waiving his right to remain silent and right to counsel, he subsequently attempted to invoke those rights and was

---

[1] "These warnings (which have come to be known colloquially as '<u>Miranda</u> rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" <u>Dickerson</u> v. <u>United States</u>, 530 U.S. 428, 435 (2000) (quoting <u>Miranda</u>, 384 U.S. at 479).

prevented from doing so by the officers. He does not claim that he later asked to be provided counsel and was denied counsel. And Bezanson-Perkins concedes that his initial waiver of his Miranda rights was a valid waiver. Thus, the question before us, as posed, is whether the officers' later statements to Bezanson-Perkins's question about the timing of his access to a lawyer, as well as their repeated statements that the truth would help him, served to invalidate his previously knowing, intelligent, and voluntary waiver of his Miranda rights so as to warrant suppression of the confession.

We review factual findings by the district court for clear error. United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003). We review the determination of whether a waiver of rights was voluntary de novo. Id.

Determining the validity of a Miranda waiver usually entails two separate inquiries. The waiver must be both voluntary, and knowing and intelligent. Moran v. Burbine, 475 U.S. 412, 421 (1986). A waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. A waiver is knowing and intelligent when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. Both inquiries are judged based on the "totality of the circumstances surrounding the interrogation." Id. (internal

quotation omitted). Assuming there has been no <u>Miranda</u> violation, then the standard shifts: "[O]nly confessions procured by <u>coercive official tactics</u> should be excluded as involuntary [under <u>Colorado</u> v. <u>Connelly</u>, 597 U.S. 157, 167 (1986)]. 'Free choice' is no longer a touchstone . . . ." <u>United States</u> v. <u>Byram</u>, 145 F.3d 405, 407 (1st Cir. 1998) (citations omitted).

There are surely situations in which statements made after a valid <u>Miranda</u> waiver are subject to suppression, for a number of reasons. For example, police may not get a <u>Miranda</u> waiver and then beat a confession out of a suspect and hope to have the confession admitted into evidence. Such a confession would be procured by coercive tactics. <u>See</u> <u>Mincey</u> v. <u>Arizona</u>, 437 U.S. 385, 401 (1978). Nor may police, against the suspect's wishes, induce intoxication or a drugged state such that any further statement by the suspect is coerced. <u>See</u> <u>id.</u>

Nor may police after a valid <u>Miranda</u> waiver disregard a suspect's later clear request for a lawyer and deny him counsel, or an assertion of the right to remain silent and continue to question him. <u>Edwards</u> v. <u>Arizona</u>, 451 U.S. 477, 484-85 (1981); <u>see also</u> <u>Davis</u> v. <u>United States</u>, 512 U.S. 452, 459 (1994). To the extent Bezanson-Perkins attempts to imply his later colloquy was a request for counsel, he does not meet the <u>Davis</u> standard that the request be clear and unequivocal. <u>Davis</u>, 512 U.S. at 459.

-11-

None of these situations is our situation here, and Bezanson-Perkins makes no real claim that the statements fall into any of these categories.

Rather, his complaint is that, after a valid Miranda waiver, during the interrogation the police misled or tricked him. He attempts to tie this allegation to the Miranda doctrine, implicitly arguing that if he had a lawyer, he would not have confessed, and was misled into confessing by the police statements. This is a categorically different type of argument than the types described above, and its relationship to Miranda is attenuated. We stress that there is no claim that he was misled or tricked into waiving his Miranda rights initially or that he later attempted to assert those rights and was forced to continue with the interrogation.

That makes this case different in kind from cases on which he relies. In Hart v. Attorney Gen. of the State of Florida, 323 F.3d 844 (11th Cir. 2003), the court held that the confession of a 17 year old should be suppressed when the suspect, despite having signed a Miranda waiver form, later evidenced confusion about his rights and seemed to want an attorney, and then was lied to by the police about the effects of not having counsel. The court held that this later interlude meant that by the time the confession was given, it could not say that the defendant had voluntarily, knowingly, and intelligently waived his Miranda

rights, and that police deception concerning those rights rendered his confession obtained in violation of Miranda. Id. at 895. Even more afield is United States v. Beale, 921 F.2d 1412 (11th Cir. 1991), which found that police deception prior to defendant's signing of a Miranda waiver rendered that waiver invalid. Id. at 1435.

Indeed, we doubt the argument, on the particular facts here, has much to do with Miranda at all. Instead, it seems to be an argument that a defendant, particularly one who, having knowingly waived his Miranda rights, and who has not asked for a lawyer thereafter, should not be subjected to duplicitous statements by police because of the risk he will make incriminating statements. See Hart, 323 F.3d at 894 ("The reason for requiring a lawyer during custodial interrogation is to protect a suspect's privilege against self-incrimination."). There is an obvious tension in the argument: defendant voluntarily and validly waived the presence of counsel and right to remain silent, thus subjecting himself to the risk of his self-incriminating responses to police misstatements not corrected by counsel; but he nonetheless seeks to immunize himself from that risk afterward by saying that because the police made misstatements, he can invalidate the waiver. It is doubtful, under Moran, that any such rule exists. 475 U.S. at 421; see also Hart, 323 F.3d at 898 (Vinson, J., dissenting).

Even assuming some limited protection is available for statements made by suspects in response to untrue statements by police, that doctrine does not help Bezanson-Perkins here. As Byram noted, some types of trickery could amount to coercion -- such as where police falsely say they will take a suspect's child away unless the suspect cooperated. See Lynumn v. Illinois, 372 U.S. 528, 534 (1963); Byram, 145 F.3d at 408. That is far from this case. And "trickery is not automatically coercion." Byram, 145 F.3d at 408. The Supreme Court has rejected challenges to confessions on the basis that they were procured by deceits. Frazier v. Cupp, 394 U.S. 731 (1969). Here, the premise that the police used deception itself fails. The district court held that the police statements, when understood in context, were not untrue and that determination was not erroneous.

We turn to the particulars.

## A. Right to Counsel

Bezanson-Perkins first argues that by telling him: "You'd have to hire your own lawyer," Officer Forey invalidated his previous waiver by misleading him as to the scope of his right to counsel.

The law about police statements made before a Miranda waiver is obtained does not help Bezanson-Perkins. His own claim, concerning statements made after a valid waiver, is that much harder to make. In Duckworth v. Eagan, 492 U.S. 195 (1989), an

-14-

officer read the defendant the following <u>Miranda</u> warnings from a waiver form:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. <u>You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning</u>. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. <u>We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court</u>. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.

<u>Id.</u> at 198. The defendant signed this waiver form, and then confessed to the crime. The Court held that these instructions did not mislead the defendant as to his <u>Miranda</u> rights. <u>Id.</u> at 200-01. It disagreed with the Court of Appeals' conclusion that the phrase "if and when you go to court" implied that the defendant could not have a lawyer present during questioning unless he hired his own. <u>Id.</u> at 203. Rather, this language accurately described the procedure for appointment of counsel in Indiana, which occurs at defendant's initial appearance in court. <u>Id.</u> at 204. Further, the Court held that this statement merely answers in advance the frequent inquiry of a defendant as to the timing of receipt of court-appointed counsel. <u>Id.</u>

The district court here correctly concluded that the statement "You'd have to hire your own lawyer" did not mislead

Bezanson-Perkins as to the scope of his right to counsel or the consequences of having waived that right. This statement occurred after Bezanson-Perkins had been accurately read his <u>Miranda</u> rights, signed the waiver form, and asked a clarifying question about the timing of court-appointed counsel and was told no lawyer was immediately available. The officers told Bezanson-Perkins that he had the right to an attorney, including the right to an attorney during questioning. Further, they told him that one would be provided for him if he could not afford one. Given this context, as the district court held, the police statement was not false or misleading. The statement was made in response to a second question about whether a lawyer, if Bezanson-Perkins wanted one, "would come right now." He had just been told there was not one "right now," yet he asked again. The statement "You'd have to hire your own lawyer" was true in that, if Bezanson-Perkins wanted a lawyer immediately, a lawyer of his own choosing, he would need to hire one. The officer then promptly told Bezanson-Perkins that if he did not want to answer any question absent a lawyer, he did not have to do so. In context, Bezanson-Perkins's claim is without force.

B. <u>Right to Remain Silent</u>

Bezanson-Perkins further argues that the officers, by continually telling him to be truthful and to help himself, invalidated his waiver of his right to remain silent, by misleading

-16-

him as to the consequences of having waived that right. In essence, Bezanson-Perkins's claim is that the officers' constant pleas to him to be truthful so deceived him about whether the truth could hurt him that he was rendered unaware that if he did confess, that confession would be used against him in court.

Bezanson-Perkins's claim clearly lacks merit. It also defies common sense. At the beginning of the interrogation, Bezanson-Perkins, independently of the officers questioning him, stated that he understood the sentencing consequences of confessing and signing a plea bargain as opposed to maintaining his innocence and going to trial. The officers merely confirmed this situation by laying out the strong evidence they had, and then asking him why, given his understanding of things, he did not take the path that was likely to lead to a lower sentence. Cf. United States v. Pelton, 835 F.2d 1067, 1073 (4th Cir. 1987) (detailing evidence against suspect and telling suspect that police would inform prosecutor that suspect cooperated does not render confession involuntary). There is no evidence that this manner of questioning led Bezanson-Perkins to believe that his confession would somehow not be used against him.

Bezanson-Perkins maintains that the most problematic statements by the officers came at the end of his first round of interrogation. Here, Forey told Bezanson-Perkins that "[t]he truth opens doors," and that "the truth from you is what I need. And if

-17-

I have that then I can run and then I do what I can to help you."
Later on, Forey stated:

> You know and I know whether you like it or not
> or whether you agree with it or not, the truth
> does help and it is going to help you in the
> long run and if you[r] ultimate goal is to get
> back -- as soon as possible, the only thing
> that's going to help you is the truth.

Again, the context in which these statements were made shows that the officers were telling Bezanson-Perkins that cooperating with them would be better for Bezanson-Perkins in terms of a lower sentence. In fact, the government ultimately agreed not to oppose Bezanson-Perkins's motion for downward departure based on his prompt acceptance of responsibility and recommended a sentence at the low end of the guidelines which was accepted by the district court at sentencing. His confession led to his plea, which led to his lower sentence. Given the strong evidence against him, it is unclear why Bezanson-Perkins is now trying to vacate his favorable sentence in favor of the risks of a much larger sentence.

**IV.**

Bezanson-Perkins also challenges certain enhancements to his sentence based on factual findings by the district judge at sentencing as a violation of his right to have all elements of his crime found by a jury beyond a reasonable doubt. See Blakely v. Washington, 124 S.Ct. 2531 (2004). The base offense level for aiding and abetting a bank robbery is 20. U.S.S.G. § 2B3.1(a). The district court found a two-level enhancement because the crime

-18-

involved taking the property of a financial institution, id. § 2B3.1(b)(1), and a three-level enhancement because the crime involved the possession and/or brandishing of a dangerous weapon, id. § 2B3.1(b)(2)(E). Thus, after Bezanson-Perkins's three-level reduction for acceptance of responsibility, id. § 3E1.1(a)-(b), Bezanson-Perkins's offense level was 22.

Bezanson-Perkins's criminal history score based solely on his prior convictions was four. The district court enhanced this level by two points because Bezanson-Perkins was on parole at the time he committed his crime, id. § 4A1.1(d), and enhanced by one point because the offense was committed within two years of his release for a felonious sexual assault, id. § 4A1.1(e). His ultimate criminal history score was thus seven, placing him in criminal history category IV. Bezanson-Perkins contends that he should be sentenced based on an offense score of 17 (base offense level of 20 minus his departure for acceptance of responsibility) and criminal history category III (based on his base criminal history score of four).

Because Bezanson-Perkins did not challenge the constitutionality of his sentencing enhancements below, our review is for plain error. See United States v. Cordoza-Estrada, 385 F.3d 56, 59 (1st Cir. 2004). Under plain error review, the challenging party has the burden of showing (1) an error, (2) that is plain, (3) that affects substantial rights (i.e. the error was not

harmless), and (4) that seriously undermines the fairness, integrity, or public reputation of judicial proceedings. <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 732 (1993). Bezanson-Perkins's claim fails at least to satisfy the second element of plain error review. <u>See</u> <u>United States</u> v. <u>Morgan</u>, 384 F.3d 1, 8 (1st Cir. 2004).

The conviction and sentence are **<u>affirmed</u>**.