# United States Court of Appeals
## For the First Circuit

No. 18-1969

UNITED STATES OF AMERICA,

Appellee,

v.

KURT CARPENTINO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Robert F. Hennessy, with whom Schnipper Hennessy, PC was on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom Scott W. Murray, United States Attorney, was on brief, for appellee.

January 17, 2020

**SELYA**, **Circuit Judge**.    Suspecting that defendant-appellant Kurt Carpentino had transported an underage girl across state lines for immoral purposes, a Vermont state trooper took him into custody.    An interview at a Vermont State Police (VSP) barracks later that day ended abruptly when the defendant asked to call a lawyer and was immediately returned to a holding cell. Forty minutes later, the defendant sought to speak with the troopers again, and the interview resumed.    This time, the defendant confessed.

After the defendant was charged federally, he beseeched the district court to suppress the confession made during the second phase of his custodial interrogation.    In support, he maintained that the interrogation had proceeded in derogation of his Fifth Amendment rights as explicated in Miranda v. Arizona, 384 U.S. 436 (1966), and Edwards v. Arizona, 451 U.S. 477 (1981). In a thoughtful rescript, the district court denied the defendant's motion.

Following a jury trial that culminated in a conviction and the imposition of a lengthy prison sentence, the defendant appeals.  He challenges only the denial of his motion to suppress. The district court's denial of his motion to suppress rested on three related findings:  that the defendant initiated the second phase of the interview, that he did not thereafter reinvoke his right to counsel, and that he knowingly and voluntarily waived his

Miranda rights before confessing.  After careful consideration, we conclude that all of these findings pass muster.  Accordingly, we affirm.

## I.  BACKGROUND

We rehearse the facts as supportably found by the district court following the suppression hearing.  See United States v. Coombs, 857 F.3d 439, 443 (1st Cir. 2017); see also United States v. Carpentino, No. 17-cr-157-PB, 2018 WL 2768656, at *1-2 (D.N.H. June 8, 2018).

Around 8:00 a.m. on April 27, 2017, a VSP trooper received a call informing him that M.H., a fourteen-year-old girl from New Hampshire, was missing.  The call directed him to proceed to an abandoned motel in Rockingham, Vermont.  Upon arrival, the trooper learned that a search party had spotted M.H. near the motel in the company of a man.  The search party suspected that the unknown man was the defendant:  he was the landlord of the premises in which M.H. was living, and his family owned the motel near where M.H. had been seen.

The trooper issued a dispatch asking other law enforcement personnel in the area to look out for the defendant's vehicle.  A local police officer stopped the defendant's vehicle shortly after 9:00 a.m.  The officer, along with others (including the trooper), detained the defendant on the side of the road and questioned him about M.H.'s whereabouts.

In the meantime, the search party located M.H., who reported that she had been kidnapped and assaulted. The trooper received this news around 9:50 a.m., arrested the defendant, and took him to a nearby barracks.

At 12:56 p.m., two troopers assigned to the investigations unit brought the defendant to an interview room. The troopers advised the defendant of his Miranda rights, and the defendant signed a waiver form. He proceeded to tell the troopers that he had driven alone from New Hampshire into Vermont the night before. The troopers challenged the defendant's truthfulness, explaining that they were collecting evidence that would likely prove his story false. At that point, the defendant said that he wanted to end the interview and talk to his lawyer. The troopers immediately ceased their questioning and, at 1:49 p.m., returned him to the holding cell. On the way to the cell, the defendant asked to place a telephone call to his lawyer. The troopers said he could do so. Notwithstanding this assurance, the troopers did not give the defendant access to a telephone.

Approximately forty minutes after being returned to his cell and before he was given access to a telephone, the defendant waved at a camera to get a guard's attention. When the guard approached the cell, the defendant asked to talk to the troopers who had previously interviewed him. The troopers came to the

defendant's cell, confirmed that he wished to speak with them, and brought him back to the interview room.

The following conversation ensued, all of which was recorded:

| | |
|---|---|
| **Trooper 2:** | I'll get you another glass [of water], and then we have to re-Mirandize you because we brought you back in. |
| **Defendant:** | How much, would, uhm, the maximum time be for something like this? |
| **Trooper 1:** | I'd have to look. You know, I don't . . . . I know a lot, but I don't know a lot of details, so I'm not sure. |
| **Defendant:** | Alright. Uhm . . . |
| **Trooper 1:** | Let me just get past this first, the administrative part. So I'm just, because we gotta go over these again. You've come to us saying "Hey, I want to talk to you again." Correct? |
| **Defendant:** | Yeah, because, uhm, one of the things that the officer said that, uhm . . . once I was done talking with you was that if [sic] was up to you if I could have a phone call to my lawyer. |
| **Trooper 1:** | Well is that what you're looking for, is a phone call to your lawyer or do you want to talk to us again? |
| **Defendant:** | Uhm, I kinda need a phone call to my lawyer, too. I |

- 5 -

**Defendant:** need to let somebody know that I'm here.

**Trooper 2:** Here you go Kurt.

**Defendant:** Thank you.

**Trooper 1:** I mean, if you want to talk to an attorney, then I can't talk to you. We can't talk to you.

**Defendant:** Alright.

**Trooper 1:** My understanding is that you indicated to somebody that you wanted to speak to us again.

**Trooper 2:** Is that true, or . . . ?

**Trooper 1:** Is that what you wanna do or do you want to talk to an attorney?

**Defendant:** I don't know. Just . . . I fucked myself.

**Trooper 2:** Well, you know us. We're just looking for the truth. That's all we're looking for.

**Defendant:** Yeah.

(Long pause)

**Defendant:** I should probably start from the beginning.

**Trooper 2:** Yeah, yeah, but we gotta get through the Miranda first.

**Trooper 1:** And Kurt, I have to make sure that we're clear on this. You want to talk to us.

- 6 -

**Defendant:**    Yeah.

**Trooper 1:**    Okay.  To do that, I have to re-go through that whole <u>Miranda</u> thing again. And if you want me to, I will.  You made mention about calling a lawyer.  If that's what you want, then we can do that, too.  But I can't do both.  I can do one or the other.

**Defendant:**    I can talk with you with a lawyer, right?

**Trooper 1:**    You can, but usually that doesn't happen.

**Defendant:**    Okay.

**Trooper 1:**    But it's up to you.  I just want you, I want to be clear with you.   I don't want . . .

**Trooper 2:**    Make sure that it's clear that it's your choice.

**Trooper 1:**    Yeah, you don't have to talk to us.

**Trooper 2:**    You're in control here, well, I mean as far as . . .

**Trooper 1:**    As far as talking to us.

**Trooper 2:**    Right.

**Defendant:**    Yeah.  I'll talk.

**Trooper 1:**    You'll talk to us.

**Defendant:**    I'll talk.

**Trooper 1:**    Ok.  I'm going to go through these again for you.  You have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer before questioning and have a lawyer present with you during any questioning.  If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before any questioning, if you wish.  In Vermont, that's called a public defender.  If you decide to answer questions, you can stop the questioning at any time.  Do you understand each of these rights I've explained to you?

**Defendant:**    Yes.

**Trooper 1:**    Do you want to talk to me now?

**Defendant:**    Fuck.  I don't know.  I'm scared.  I don't know what's going on.  Yeah, I'll talk.  I just . . . I don't know how long, like, I'd be stuck here.  Like, is there like an arraignment or something?

**Trooper 1:**    Yeah.  I'll explain all that.  That's no big deal.  Can I just get through this?

**Defendant:**    Am I ready to talk to you, right?

**Trooper 2:**    What's that?

| Defendant: | We're at "am I ready to talk . . . ," "am I willing to talk to you?" |
|---|---|
| Trooper 2: | Yeah. |
| Trooper 1: | Mmm Hmm. Yes. I'm going to read you the waiver again. It says "I have been advised that I have the right to remain silent, to be represented by a lawyer and to talk with one prior to questioning and to have one present during questioning. Knowing my rights, I agree to waive them and talk to you now. No threats or promises have been made to me." Do you understand all that? |
| Defendant: | I understand. |
| Trooper 1: | What time you got? This is the same thing I read to you before. If you agree to it, feel free to read it. |

At 3:03 p.m., the defendant signed a second Miranda waiver. The troopers resumed the interview and, about thirty minutes later, the defendant confessed to driving M.H. from New Hampshire to Vermont and having sex with her in Vermont.

On October 4, 2017, a federal grand jury sitting in the District of New Hampshire returned a four-count indictment against the defendant. Early in the proceedings, the government voluntarily dismissed three of the counts. This left only the

charge of interstate transportation of a minor with intent to engage in criminal sexual activity.  See 18 U.S.C. § 2423(a).

In advance of trial, the defendant moved to suppress his confession on the ground that the second phase of the interview transpired in violation of his <u>Miranda</u> rights.[1]  The district court held an evidentiary hearing and denied the motion to suppress. The court concluded that, although the defendant had invoked his right to counsel during the first phase of the interview, he subsequently initiated an investigation-related conversation with the troopers; that the defendant did not unambiguously reinvoke his right to counsel during the second phase of the interview; and that he knowingly and voluntarily waived his <u>Miranda</u> rights before confessing.  See <u>Carpentino</u>, 2018 WL 2768656, at *2-4.  After a four-day trial during which the government played a recording of the confession, the jury convicted the defendant.  The district court sentenced him to a 384-month term of immurement.  This timely appeal ensued.

## II. ANALYSIS

The defendant's challenge to the denial of his motion to suppress rests on a claim that the troopers procured his confession in derogation of his <u>Miranda</u> rights.  <u>Miranda</u> and its progeny

---

[1] At the same time, the defendant moved to suppress statements made during his roadside detention.  The district court refused to suppress those statements, and the defendant does not challenge that ruling on appeal.

require that law enforcement officers provide warnings concerning certain Fifth Amendment rights — including the right to remain silent and the right to consult an attorney — before interrogating a suspect in a custodial setting. See United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011); United States v. Conley, 156 F.3d 78, 82 (1st Cir. 1998). Absent such warnings, most statements that officers obtain during a custodial interrogation are inadmissible at trial. See Conley, 156 F.3d at 82. Once a suspect is advised of his Miranda rights, though, he may waive those rights and consent to an interrogation. See Edwards, 451 U.S. at 484. If the suspect invokes his right to counsel at any point during the interrogation, all questioning must cease either until an attorney is present or until the suspect initiates further communication with the officers. See id. at 484-85; Johnston v. Mitchell, 871 F.3d 52, 57-58 (1st Cir. 2017); Conley, 156 F.3d at 82-83.

In the case at hand, both parties agree that the interview at the barracks constituted custodial interrogation and, thus, that compliance with the imperatives of Miranda and its progeny serves as a condition precedent to the admissibility of the confession. Similarly, there is no dispute that the defendant invoked his right to counsel during the first phase of the custodial interview and that the troopers, as required, immediately ended the interview.

The crux of the matter, then, is the second phase of the interview — and the defendant's asseverational array focuses on that phase.  He challenges each of the three subsidiary findings upon which the district court rested its denial of his motion to suppress.  Specifically, he contends that he did not initiate a generalized discussion of the investigation with the troopers; that he reinvoked his right to counsel; and that he did not knowingly and voluntarily waive his Miranda rights before confessing.

Our standard of review is familiar.  We assay a district court's findings of fact on a motion to suppress for clear error.  See Hughes, 640 F.3d at 434.  Within this rubric, we are bound to accept all reasonable inferences drawn by the district court from those facts.  See Coombs, 857 F.3d at 445-46.  Questions of law engender de novo review.  See Hughes, 640 F.3d at 434.  Against this backdrop, we address the defendant's three assignments of error sequentially.

### A. Initiation.

To begin, the defendant argues that the court below erred in concluding that he initiated communication with the troopers about the investigation after he had terminated the first phase of the interview.  Even so, the defendant does not deny that he initiated what would become the second phase of the interview by waving from his cell at a camera and requesting to speak to the

troopers. He says, though, that he sought to speak with the troopers for the sole purpose of inquiring about the promised telephone call to his lawyer. Because he did not initiate a conversation about the substance of the investigation, his thesis runs, his invocation of the right to counsel during the first phase of the interview remained velivolant and barred the troopers from seeking a renewed Miranda waiver and resuming their interrogation.

The relevant facts are not in dispute and, thus, we review de novo the district court's conclusion that the defendant initiated investigation-related communication with the troopers. See, e.g., United States v. Thongsophaporn, 503 F.3d 51, 56-57 (1st Cir. 2007); United States v. Fontana, 948 F.2d 796, 806 (1st Cir. 1991); see also United States v. Straker, 800 F.3d 570, 621 (D.C. Cir. 2015) (per curiam).

As previously explained, the Edwards Court held that law enforcement officers may not continue to interrogate a suspect in custody who has invoked his right to counsel until an attorney is present.[2] See 451 U.S. at 484-85; see also Johnston, 871 F.3d at 57-58. Any subsequent questioning at the officers' behest without

---

[2] The language that the Supreme Court employed in Edwards suggested only that law enforcement could resume an interrogation once "counsel has been made available" to the suspect. 451 U.S. at 484-85. The Court subsequently clarified that officers "may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Minnick v. Mississippi, 498 U.S. 146, 153 (1990).

a lawyer present is impermissible because, even if the officers obtain a <u>Miranda</u> waiver, that waiver is presumed to be involuntary. See <u>Maryland</u> v. <u>Shatzer</u>, 559 U.S. 98, 104-05 (2010). This rule is designed to prevent officers from badgering a suspect into confessing in the inherently coercive environment of a custodial interrogation. See <u>id.</u> at 105. Withal, it is common ground that officers may resume questioning a suspect who has invoked his right to counsel without an attorney present if the suspect "himself initiates further communication, exchanges, or conversations." <u>Edwards</u>, 451 U.S. at 484-85. To qualify for this exception, the suspect must initiate this further communication without coercion or probing. See <u>United States</u> v. <u>Montgomery</u>, 714 F.2d 201, 204 (1st Cir. 1983).

Although courts have "broadly interpreted" the circumstances that constitute initiation under <u>Edwards</u>, <u>Fontana</u>, 948 F.2d at 805, not all communication initiated by a suspect paves the way for officers to resume investigation-related questioning. If, say, the suspect makes "merely a necessary inquiry arising out of the incidents of the custodial relationship," officers may not commence an uncounseled interrogation. <u>Thongsophaporn</u>, 503 F.3d at 56 (quoting <u>Oregon</u> v. <u>Bradshaw</u>, 462 U.S. 1039, 1046 (1983) (plurality opinion)). Such "necessary" inquiries are often mundane; they include, for example, a request for a telephone, clamor for food or water, and a declared need for access to a

restroom. Bradshaw, 462 U.S. at 1045 (plurality opinion); see Fontana, 948 F.2d at 806. Conversely, a suspect opens the door to further questioning if his comments "evince[] a willingness and a desire for a generalized discussion about the investigation." Thongsophaporn, 503 F.3d at 56 (quoting Bradshaw, 462 U.S. at 1045-46 (plurality opinion)). The initiation inquiry focuses not on the suspect's subjective intent but, rather, on the objective reasonableness of the officer's interpretation of the suspect's statements. See Straker, 800 F.3d at 623; see also Bradshaw, 462 U.S. at 1046 (plurality opinion).

Here, a reasonable officer in the troopers' shoes could have understood the defendant to be seeking to resume a generalized discussion of the investigation. To begin, there is no dispute that the defendant sought out further communication with the troopers; he secured their attention by waving at the camera in his cell and then confirmed that he wanted to speak to them. When the troopers escorted the defendant to the interview room, his very first question zeroed in on the crime that the troopers were investigating: "How much, would, uhm, the maximum time be for something like this?" A reasonable officer could have interpreted this case-related question from the defendant as evincing a desire on his part to discuss the investigation. Indeed, the defendant's question concerned the investigation far more directly than a number of vague queries that we previously have held constituted

- 15 -

initiation.  See, e.g., Thongsophaporn, 503 F.3d at 56 (asking "what was going on[?]"); Conley, 156 F.3d at 83 (asking "what's this all about?"); Fontana, 948 F.2d at 806 (asking "[w]hat's going to happen to me?"); see also Bradshaw, 462 U.S. at 1045 (plurality opinion) (asking "what is going to happen to me now?").

The defendant strives to persuade us to look beyond this investigation-related question.[3]  He argues that his subsequent exchange with the troopers makes manifest that his real (and exclusive) purpose in seeking to speak with the officers was to facilitate a telephone call to his lawyer.  This argument derives from the defendant's response to the troopers' next question, which asked whether he wanted to talk to them; he replied, "Yeah, because, uhm, one of the things that the officer said that, uhm . . . once I was done talking with you was that if [sic] was up to you if I could have a phone call to my lawyer."  When the troopers asked for clarification about whether he wished to speak with them or (alternatively) to call his lawyer, the defendant responded, "Uhm, I kinda need a phone call to my lawyer, too.  I need to let somebody know that I'm here."

_____

[3] The government contends that the initiation inquiry must end with the defendant's question about the maximum sentence for the crime and that his subsequent statements are relevant only to whether he reinvoked his right to counsel.  Because these statements do not alter our conclusion, see infra, we do not address the government's contention about the proper scope of the initiation inquiry.

This exchange does not demonstrate that a reasonable officer would have understood the defendant to be initiating communication for the purpose of securing a call to his lawyer. Given the defendant's initial question about the maximum sentence for the crime, the troopers reasonably could have thought that he was expressing a desire for a generalized discussion about the investigation. When the troopers attempted to confirm this desire, the defendant suggested that he might want to call his lawyer. Faced with a glaring ambiguity, the troopers sought to resolve it: they explicitly asked the defendant whether he wanted to speak to them or to his lawyer. The defendant replied that he needed to call his lawyer "too." In light of the dual purposes for initiating communication to which the defendant had just adverted, a reasonable officer could have interpreted this statement to mean that the defendant wanted both to speak with the troopers about the investigation and to call his lawyer. Although the defendant may subjectively have intended that the conversation with the troopers take place with his lawyer present, his words do not make any such intention clear.

The short of it is that the defendant initiated investigation-related communication with the troopers when he asked to speak with them and proceeded to inquire about the maximum sentence for the crime. Nothing in his subsequent exchange with the troopers would have made clear to a reasonable officer that

the defendant initiated communication for the sole purpose of securing access to a telephone to call his lawyer. Consequently, we hold that the troopers did not abridge the defendant's right to counsel by subsequently seeking a Miranda waiver and resuming the custodial interrogation without an attorney present.

## B. Reinvocation.

We turn next to the defendant's challenge to the district court's determination that he did not reinvoke his right to counsel during the second phase of the interview. This challenge consists of the defendant's contention that his two references to calling his lawyer at the beginning of the conversation constituted unambiguous requests to speak to his lawyer. Because the troopers turned a deaf ear to his invocation of the right to counsel and resumed questioning him, his contention continues, the interrogation proceeded in derogation of his Miranda rights. The district court's conclusion that these statements did not constitute an invocation of the right to counsel is reviewed de novo. See, e.g., United States v. Sweeney, 887 F.3d 529, 536 (1st Cir.), cert. denied, 139 S. Ct. 322 (2018); United States v. Oquendo-Rivas, 750 F.3d 12, 19 (1st Cir. 2014); see also United States v. Potter, 927 F.3d 446, 450 (6th Cir.), cert. denied, ___ S. Ct. ___ (2019).

It is well-settled that an invocation of the right to counsel — the trigger that mandates an immediate halt to law

- 18 -

enforcement interrogation under Edwards — requires a clear and unambiguous request for the assistance of an attorney. See Obershaw v. Lanman, 453 F.3d 56, 64 (1st Cir. 2006); Bui v. DiPaolo, 170 F.3d 232, 239 (1st Cir. 1999). If a suspect makes no more than an ambiguous reference to an attorney, the interrogation may continue. See Sweeney, 887 F.3d at 536. Like the initiation inquiry, the test for invocation of the right to counsel is objective, asking "whether the suspect has 'articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Obershaw, 453 F.3d at 64 (alteration in original) (quoting Davis v. United States, 512 U.S. 452, 459 (1994)).

Moreover, Miranda and its progeny protect the right of a suspect to an attorney's assistance only in handling a custodial interrogation. See Grant-Chase v. Comm'r, N.H. Dep't of Corr., 145 F.3d 431, 436 (1st Cir. 1998). To invoke the right to counsel in such a situation, a suspect must therefore "unequivocally demand assistance, request the lawyer's presence, or otherwise clearly indicate an unwillingness to make a statement absent presence of an attorney." Oquendo-Rivas, 750 F.3d at 19. When a suspect makes a request for a lawyer and that request is ambiguous as to purpose, officers may — but are not required to — attempt to clarify whether the suspect wants a lawyer to assist with the custodial

- 19 -

interrogation or for some other reason.  See Grant-Chase, 145 F.3d at 436 & n.5.  In sum, law enforcement officers must cease an interrogation upon a request for an attorney only if the suspect unequivocally expresses "his wish for the particular sort of lawyerly assistance that is the subject of Miranda."  McNeil v. Wisconsin, 501 U.S. 171, 178 (1991).

The record makes manifest that the defendant did not clearly and unambiguously request the assistance of counsel at the start of the second phase of the interview.  When the troopers sought to confirm that the defendant wanted to speak to them again, the defendant responded, "Yeah, because, uhm, one of the things that the officer said that, uhm . . . once I was done talking with you was that if [sic] was up to you if I could have a phone call to my lawyer."  Although this response suggested that the defendant wanted to speak with a lawyer at some point, the timing of the request — "once [he] was done talking with [the troopers]" — was inherently ambiguous.  In light of his prior question about the maximum sentence for the crime, the defendant could have been requesting a call to his lawyer either then and there or instead only after he spoke to the troopers again about the investigation. Given this temporal ambiguity, the defendant's statement did not "clearly indicate an unwillingness to make a statement absent presence of an attorney."  Oquendo-Rivas, 750 F.3d at 19.

Nor did the defendant's next statement — "Uhm, I kinda need a phone call to my lawyer, too.  I need to let somebody know that I'm here." — constitute a clear invocation of the right to counsel.  As we have explained, a reasonable officer could have interpreted the defendant's use of the word "too" to mean that he wanted both to speak with the troopers about the investigation and to call his lawyer after doing so.  Moreover, given the sequence of the two sentences, the troopers reasonably could have understood the defendant to be seeking a telephone call to his lawyer for the purpose of letting someone know where he was.  To be sure, a suspect need not refer expressly to the interrogation or to a desire for legal advice in order to invoke his right to counsel.  Cf. Davis, 512 U.S. at 459 (quoting approvingly Justice Souter's statement, in dissent, that "a suspect need not 'speak with the discrimination of an Oxford don'").  And it is possible that the defendant subjectively wanted to let his lawyer know where he was so that his lawyer could help him with the interrogation.  From the perspective of a reasonable officer, though, the defendant's two statements, including the suggestion of his purpose in seeking the telephone call, failed to make clear that he wanted to speak with his lawyer in order to secure assistance with the impending interview.  See McNeil, 501 U.S. at 178.

In an effort to blunt the force of this reasoning, the defendant argues that any reasonable officer would have

interpreted his statement to request his lawyer's assistance with the interrogation because he had made a clear request to that effect an hour earlier (at the end of the first phase of the interview). But the defendant's decision to initiate investigation-related communication with the troopers undermines this argument. A reasonable officer could well have thought that the defendant had changed his mind about his decision not to submit to further questioning without his lawyer present. What is more, the defendant knew from the first phase of the interview that the conversation would end if he requested his lawyer's presence — yet he still expressed a desire to continue the conversation with the troopers.

In a further effort to turn the tide, the defendant suggests that the setting of the request — during a custodial interrogation — renders unreasonable any inference that he asked to speak to his lawyer for a purpose other than to secure assistance with the interview. This suggestion has a patina of plausibility: a request to consult an attorney made during a custodial interrogation is often, as a factual matter, interposed for the purpose of securing assistance with that interrogation. See Grant-Chase, 145 F.3d at 436 n.5. But there is no "irrebuttable presumption" that ascribes this purpose to all such requests. Id. Given the defendant's intimation that he wanted to speak to the troopers about the investigation and the reasonable

inference that he sought to call his lawyer to tell somebody where he was, the defendant's statement was ambiguous as to purpose.

Confronted with this ambiguity, the troopers prudently explained to the defendant that they could not talk with him if he wished to speak to his lawyer. Yet at no subsequent point during the interview did the defendant request the assistance of counsel. On this record, we conclude that the defendant did not unambiguously invoke his right to counsel the second time around and, thus, the troopers were free to proceed with the resumed phase of the interview. See Sweeney, 887 F.3d at 536.

## C. Waiver.

This brings us to the defendant's contention that he did not waive his Miranda rights knowingly and voluntarily before confessing. Although he twice signed a Miranda waiver, the defendant contends that he did not fully understand the rights he was relinquishing. And he adds that he was coerced into executing the second waiver form. The district court rejected these contentions, concluding that the defendant's waiver was both knowing and voluntary. Because the factual predicate is undisputed, we review this conclusion de novo. See United States v. Rojas-Tapia, 446 F.3d 1, 3 (1st Cir. 2006).

We begin with bedrock: most statements made by a suspect during a custodial interrogation are inadmissible at trial absent a valid waiver of Miranda rights. See Berghuis v. Thompkins, 560

- 23 -

U.S. 370, 382 (2010). A suspect does not waive his Miranda rights merely by initiating investigation-related communication with law enforcement officers after previously asserting his right to counsel. See Judd v. Vose, 813 F.2d 494, 497 (1st Cir. 1987) (explaining that initiation and waiver are separate analytic steps). Because "[i]nvocation and waiver are entirely distinct inquiries," James v. Marshall, 322 F.3d 103, 108 (1st Cir. 2003) (quoting Smith v. Illinois, 469 U.S. 91, 98 (1984) (per curiam)), the fact that a suspect does not invoke either his right to remain silent or his right to counsel likewise does not itself establish the necessary waiver of rights, see Berghuis, 560 U.S. at 382. "What is required is a clear showing of the intention, intelligently exercised, to relinquish a known and understood right." United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993).

It follows that in order to determine the validity of a Miranda waiver, we must ask whether, appraised in light of all the circumstances, the waiver was both knowing and voluntary. See United States v. Bezanson-Perkins, 390 F.3d 34, 39-40 (1st Cir. 2004). A waiver is made knowingly if a suspect has "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon." Sweeney, 887 F.3d at 535-36 (quoting United States v. Rosario-Díaz, 202 F.3d 54, 69 (1st Cir. 2000)). By the same token, a waiver is made voluntarily

- 24 -

if the waiver is "the product of a free and deliberate choice rather than intimidation, coercion and deception." Id. (quoting Rosario-Díaz, 202 F.3d at 69). An inquiring court must start with a presumption that the suspect did not waive his rights, and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence. See United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003).

In the case at hand, we think that the government has carried its burden of showing that the defendant knowingly and voluntarily waived his Miranda rights for a second time before confessing to the troopers. After the defendant initiated the second phase of the interview, the troopers twice told him that they would have to end their questioning if he said that he wanted to talk with his lawyer. Relatedly, the troopers informed the defendant that he did not have to speak with them. Despite these forthright statements, the defendant nonetheless declared — not once but three times — that he wanted to talk. The troopers read the defendant his Miranda rights twice; the defendant both times confirmed that he understood those rights; and the defendant then signed a waiver form and agreed to speak with the troopers. Under these circumstances, such a written waiver is strong evidence of the knowing and voluntary nature of the defendant's relinquishment of his Miranda rights. See North Carolina v. Butler, 441 U.S. 369, 373 (1979). Taken as a whole, the record before us evinces

an uncoerced choice by the defendant to waive his <u>Miranda</u> rights with a complete understanding of those rights.

The defendant protests. To put meat on the bones of his protest, he points to certain conditions of his detention and certain aspects of his conversation with the troopers that, in his view, suggest that his second waiver was neither knowing nor voluntary. But these protestations, whether viewed separately or in combination, do not undercut the validity of his waiver.

At the outset, the defendant claims that the troopers' failure to provide him access to a telephone to call his lawyer clouds the voluntariness of his waiver. He points out that the troopers must have known that he wanted to call his lawyer because he had invoked his right to counsel during the first phase of the interview and, on his way back to the holding cell, had specifically asked to place such a call. He adds that the troopers did not arrange this call during the roughly hour-long period that elapsed before the second phase of the interview got underway.

As an initial matter, we take note that individuals in law enforcement custody have no absolute constitutional right to use a telephone. <u>See</u> <u>United States</u> v. <u>Footman</u>, 215 F.3d 145, 155 (1st Cir. 2000). "<u>Miranda</u> does not require that attorneys be producible on call, but only that the suspect be informed . . . that he has the right to an attorney before and during questioning . . . ." <u>Duckworth</u> v. <u>Eagan</u>, 492 U.S. 195, 204 (1989).

Nevertheless, the failure of law enforcement officers to allow a suspect to call his attorney may affect the voluntariness of a Miranda waiver if that failure coerces into acquiescence a suspect who would not otherwise waive his rights. The defendant contends that his inability to call his lawyer coerced him in this manner.

This contention lacks force. Here, the record is utterly devoid of any explanation as to why the troopers did not allow the defendant to call his lawyer during the hour between the two phases of the interview. The defendant's failure to develop the record on this point is fatal to his claim that his inability to call his lawyer rendered his waiver involuntary. An hour-long delay in providing a detainee with access to a telephone is not inherently unreasonable, and the defendant has offered no evidence that the delay in this case was unjustified. Cf. United States v. Chapdelaine, 616 F. Supp. 522, 531 (D.R.I. 1985) (Selya, J.) (finding no waiver of Miranda rights in part because the defendant was not permitted to call attorney until next day despite multiple requests to do so), aff'd, 795 F.2d 75 (1st Cir. 1986) (unpublished table decision). Nor does the record suggest that the troopers were employing a deliberate stratagem of denying telephone access to suspects who ask to speak with their lawyers.

In all events, we have no principled way to conclude that the hour-long delay coerced the defendant into waiving his Miranda rights on the mistaken belief that he would otherwise never

- 27 -

be able to call his lawyer. Before the troopers secured the waiver, they asked the defendant multiple times if he wanted to speak with his lawyer and emphasized that they would end the interview if he chose that option. Notwithstanding these inquiries, the defendant failed unequivocally to invoke his right to counsel at the start of the second phase of the interview. In the absence of a developed record, the troopers' clear explanation of the right to counsel and the defendant's failure to demand the assistance of his lawyer render implausible the contention that the absence of the telephone call somehow coerced the defendant into waiving his rights.

Let us be perfectly clear. We do not in any way condone the VSP's failure to facilitate the defendant's requested telephone call. Best police practices plainly entail providing a suspect with prompt access to an attorney upon request. Here, though, the lack of a developed record means that we have no principled way of assessing the practical considerations that may have been in play in this case. Under these circumstances, the failure to afford the defendant a more prompt telephone call did not render the defendant's <u>Miranda</u> waiver involuntary.[4]

---

[4] Relatedly, the defendant claims that the troopers' failure to facilitate his contact with his lawyer violated Vermont statutory law. <u>See</u> Vt. Stat. Ann. tit. 13, § 5234(a). We need not address this claim. Although the circumstances surrounding the nonoccurrence of the telephone call are relevant to the waiver analysis, the defendant identifies no authority — and we are aware

- 28 -

Next, the defendant complains that the repeated urging by various officers that he should tell the truth and cooperate coerced him into waiving his Miranda rights. We do not agree. Neither an admonition to tell the truth (even if repeated) nor a suggestion that cooperation would lead to favorable treatment is enough, without more, to constitute impermissible coercion. See United States v. Jacques, 744 F.3d 804, 809-10 (1st Cir. 2014); Bezanson-Perkins, 390 F.3d at 42-43.

To be sure, the arresting officer went a step further and threatened (during the traffic stop) that, if the defendant withheld information, the officer "would do everything in [his] power to see that [the defendant] went back to jail for as long as possible." Such a threat of retaliation, though, is just one factor relevant to a voluntariness analysis and is probative of coercion only if it has a significant impact on the suspect. See Jacques, 744 F.3d at 810-11. Here, the record does not show any demonstrable impact of the officer's threat on the defendant — or for that matter, any connection whatsoever between the threat and

of none — suggesting that the violation of a state statute during a custodial interrogation automatically renders a suspect's Miranda waiver involuntary. Cf. United States v. Doe, 170 F.3d 1162, 1167-68 (9th Cir. 1999) (upholding Miranda waiver notwithstanding government's violation of federal statute requiring arresting officers to notify juvenile's parents of juvenile's Miranda rights prior to interrogation).

- 29 -

the defendant's decision (more than six hours later) to waive his Miranda rights.

With respect to the conditions of his detention, the defendant focuses on the lack of food and sleep and the six hours that passed before he signed the second waiver form. We approach this aspect of the defendant's argument mindful that the deprivation of basic necessities, coupled with an unreasonably prolonged detention or interrogation, can affect the voluntariness of a Miranda waiver. See Berghuis, 560 U.S. at 387. Even so, a defendant asserting that a waiver was involuntary on this or any other basis must show some form of coercive law enforcement conduct or overreaching. See Colorado v. Connelly, 479 U.S. 157, 170 (1986); Rojas-Tapia, 446 F.3d at 7.

In this instance, the defendant fails to link the allegedly weakened physical condition he suffered from his lack of food and sleep to any police misconduct. The troopers did know that the defendant had not slept much the night before or eaten that morning — he told them as much during the first phase of the interview — but the defendant provides no evidence that he appeared weak or that he asked for and was denied food or an opportunity to sleep. See United States v. Acosta-Colón, 741 F.3d 179, 200 (1st Cir. 2013). And the troopers' provision of water for the defendant on several occasions during the interview weakens any inference that the failure to feed him during those six hours was coercive.

So, too, because the interviews transpired during the late morning and early afternoon hours, the troopers did not coerce the defendant by failing, on their own initiative, to offer him an opportunity to sleep. Given the totality of the circumstances, the defendant has not shown that the troopers either caused or took advantage of his hunger or exhaustion in a way that rendered his waiver involuntary.

Nor does the six-hour duration of the detention, in and of itself, invalidate the defendant's waiver. Courts generally find involuntariness based on the length of a suspect's detention or interrogation only when that factor is "accompanied . . . by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats." Berghuis, 560 U.S. at 387. No such indicia of coercion are present in this case. Here, moreover, the spells of alternating detention and questioning (lasting, in the aggregate, just over six hours) were insufficiently lengthy or numerous to raise an inference that the defendant's will was overborne.[5] See, e.g., Davis v. North

---

[5] The defendant mentions that his detention exceeded the six-hour safe harbor limned in 18 U.S.C. § 3501(c). This provision modified the McNabb-Mallory rule — which requires suppression of a confession, even if voluntary, made after an unreasonable delay in presentment, Mallory v. United States, 354 U.S. 449, 454-55 (1957); McNabb v. United States, 318 U.S. 332, 340, 342-45 (1943) — to apply only when the defendant confesses more than six hours after arrest. See Corley v. United States, 556 U.S. 303, 322 (2009). The defendant does not seek suppression based on a delay in presentment, though, and there is no per se rule rendering

Carolina, 384 U.S. 737, 742, 746-47 (1966) (finding confession involuntary when defendant was interrogated daily for sixteen days); Leyra v. Denno, 347 U.S. 556, 561 (1954) (same when defendant faced "days and nights of intermittent, intensive police questioning").

The defendant's contention that the troopers misled him about the nature of his Miranda rights is similarly unavailing. The defendant asserts that the troopers tricked him into believing that he would lose his only chance to speak with them about the crime if he did not agree to an uncounseled interview on the spot. He stresses the troopers' statement that he could speak to them with an attorney but "usually that doesn't happen." The defendant posits that this "now-or-never" choice is inconsistent with Miranda, which protects a suspect's right to have a lawyer present for any future questioning. See 384 U.S. at 470.

The test for the validity of a Miranda waiver requires that we examine the troopers' statements in context. Cf. Duckworth, 492 U.S. at 204-05 (evaluating adequacy of Miranda warnings by examining entirety of officers' explanations of suspect's rights). Viewed holistically, the troopers' explanation of the defendant's rights was clear. They accurately told the defendant — not once but twice — that they could not question him

invalid any Miranda waiver secured more than six hours after arrest but before presentment.

- 32 -

if he requested an attorney. They also told him — not once but thrice — that he could speak to them with an attorney if he so desired. The totality of the conversation fails to support a claim that the troopers tricked the defendant into thinking that his only chance to speak with them was then and there, without an attorney.

If more were needed (and we do not think that it is), the defendant conceded in the district court that the allegedly deceptive statement on which he hinges his argument — that he could speak to the troopers with an attorney but "usually that doesn't happen" — was true as a matter of fact. Even though "statements that are literally true can nonetheless be misleading," Hughes, 640 F.3d at 439, this was not such a statement. The troopers told the defendant several times that he could speak to them with a lawyer if he wished to do so. The troopers may have thought that telling the defendant that counseled interviews are rare would induce him to agree to talk, but even "the use of chicanery does not automatically undermine the voluntariness" of a Miranda waiver. Id.; see United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000) ("[T]rickery can sink to the level of coercion, but this is a relatively rare phenomenon."). Perscrutation of the record affords no reason to believe that the troopers' statements to the defendant distorted his judgment about whether to waive his Miranda rights.

In a last-ditch effort to demonstrate the invalidity of his waiver, the defendant points to what he claims was the fear and confusion that he expressed right before signing the waiver form: "Fuck. I don't know. I'm scared. I don't know what's going on. Yeah, I'll talk. I just . . . I don't know how long, like, I'd be stuck here. Like, is there like an arraignment or something?" But the most plausible inference from this record is that the fear the defendant voiced came from his realization that he was facing significant legal trouble. A suspect's decision to waive his Miranda rights upon such a realization may be foolish, but that does not make it involuntary or unknowing. See United States v. Rang, 919 F.3d 113, 120 (1st Cir.) ("The Constitution guards against compulsion by the state, not poor decision-making by defendants."), cert. denied, 140 S. Ct. 44 (2019).

And although the defendant expressed confusion about his right to an arraignment, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987). To show a knowing waiver, the government need only demonstrate that the defendant knew that he could remain silent and request a lawyer and that his statements could be used against him. See id.; Moran v. Burbine, 475 U.S. 412, 422-23 (1986). The government has made that showing here: the

- 34 -

defendant's confusion about his right to an arraignment does not cast doubt upon his comprehension of his Miranda rights.

That effectively ends this aspect of the matter.[6] We find that the defendant agreed to waive his Miranda rights after the troopers repeatedly advised him of those rights and the consequences of his waiver. He made this choice freely, without coercion on the troopers' part. Accordingly, we hold that the defendant's second Miranda waiver was both knowing and voluntary and that his subsequent confession was therefore admissible at trial. See Berghuis, 560 U.S. at 382; United States v. Faust, 853 F.3d 39, 47-48 (1st Cir. 2017).

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

[6] In addition to the arguments already addressed, the defendant adverts in passing to two other circumstances that might, in theory, affect the admissibility of his confession. First, he says that his detention had lasted seven hours by the time he confessed, suggesting the possibility that his confession (as opposed to his Miranda waiver) was involuntary. Second, he says that the troopers lied when they told him (during the first phase of the interview) that witnesses had seen him with M.H. at the abandoned motel. The defendant has not adequately developed either of these arguments and has, therefore, waived them. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").