# United States Court of Appeals
## For the First Circuit

No. 08-2505

UNITED STATES OF AMERICA,

Appellee,

v.

RICARDO MEJIA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Boudin, Stahl, and Lipez, Circuit Judges.

George J. West, by Appointment of the Court, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, and Sandra R. Hebert, Assistant United States Attorney, were on brief for appellee.

March 12, 2010

**STAHL, <u>Circuit Judge</u>**.  Defendant-appellant Ricardo Mejia raises a variety of objections to his conviction for conspiring to distribute 500 grams or more of cocaine and possession of a firearm in furtherance of a drug crime.  He also objects to his sentence.  After careful consideration, we affirm his conviction and sentence in all respects.

## I.  Factual Background

a. The Drug Deal

Mejia and his co-defendant Eudy Tejada-Pichardo ("Tejada") were arrested on December 18, 2006, immediately following the sale of two kilograms of cocaine to two government informants, Ambioris Falette and Marie Perez.  Prior to the sale, the Drug Enforcement Agency (DEA) recorded two phone calls between Tejada and the informants discussing Tejada's plan to sell the informants multiple kilograms of cocaine in Providence, Rhode Island.  Mejia, the appellant here, was neither a part of these conversations nor was he mentioned during them.  However, according to phone records entered into evidence, in the six weeks preceding the drug deal Mejia and Tejada phoned each other over 470 times, including once on the night that the deal took place.  In addition, during a third recorded phone call between Tejada and the informants on the night of the deal, Tejada stated that "<u>we</u> are already heading over there." (emphasis added).

On the night of the deal, Tejada and Mejia arrived together at a McDonald's restaurant in Providence in a green car. Informant Perez arrived in a red car and informant Falette subsequently arrived in a car owned by the DEA. When Falette arrived in the parking lot, Tejada, Mejia, and Perez emerged from the McDonald's restaurant. Tejada then removed a suitcase from Perez's car, placed it in Falette's car and then got into the car with Falette. While Tejada was moving the suitcase, Mejia stood near Perez's car, looking back and forth and up and down the street. According to testimony from a DEA agent who observed the exchange, Mejia's actions resembled "counter-surveillance." After the suitcase was moved, Mejia got into the passenger seat of Perez's car and both cars left the parking lot. (According to the DEA recordings, the plan was to drive to another location where Falette would pick up the cash payment and give it to Tejada. Tejada's car remained unoccupied and parked in the parking lot.)

Soon after, police officers stopped both cars and arrested Mejia and Tejada. The police found two kilograms of cocaine in a hidden compartment in the suitcase and a loaded .45 caliber pistol with an obliterated serial number on the floor of Perez's car, just behind the driver's seat and with the handle pointed toward the passenger's seat, where Mejia had been sitting. A search of Tejada's car, still parked at the McDonald's, turned up a small notebook containing lists of names paired with numbers. A

DEA agent later testified that this was a "drug ledger."[1] The notebook also bore a signature which matched the one that Mejia subsequently placed on a <u>Miranda</u> form. A search of Mejia's person following his arrest yielded numerous pieces of paper which bore notations that were similar to those in the notebook, were written in the same handwriting, shared several names in common with those appearing in the notebook, and contained columns and numbers that corresponded to the going rate of cocaine.

b. Mejia's Admissions

At the scene of the arrest, Detective Andres Perez, a native Spanish speaker, orally advised Mejia of his Miranda rights in Spanish. Once at the police station, Mejia was again advised orally, in Spanish, of his rights. Detective Perez then confirmed that Mejia could read Spanish and gave Mejia a Spanish-language form that delineated his Miranda rights. Officer Perez also read each of the rights out loud in Spanish from the text of the form and asked Mejia whether he understood his rights. Mejia indicated that he did and then placed his initials next to each of the enumerated rights and initialed a statement in Spanish that the police had made no threats or promises to him; he also checked a

_____

[1]According to testimony at trial from a DEA agent, the notebook contained lists of customer names paired with drug quantities and amounts of money collected. The quantity of drugs listed in each section added up to around 1,000, while the paired remittance amounts added up to around $21,000. The agent testified that these values corresponded to the fact that 1,000 grams of cocaine had a market value of between $18,000 and $23,000 at that time.

box indicating that he understood his rights. Finally, Detective Perez told Mejia that, if he wished, he could sign his name to the bottom of the form and Mejia elected to do so. It is uncontroverted that the form contained no language regarding waiver of rights; it only laid out the content of Mejia's Miranda rights.

After signing the form, Mejia began answering questions posed to him by Detective Perez and the other officer present, Agent Michael Naylor.[2] According to Perez's translation of Mejia's oral statements, Mejia told the officers that Tejada had given him the gun when they were in the McDonald's, that he had then tucked the gun into his waistband, and that he had placed the gun under the driver's seat of the informant's car when he saw police approaching. Mejia also said that his job was to "protect" Tejada and "watch his back," though when the police asked what he was protecting Tejada from, he merely stated "you know." Mejia also said that he "assumed" the transaction that took place was a drug deal. After making these statements, Mejia offered to become a government informant. When the officers attempted to commit Mejia's statements to writing, Mejia became evasive and the officers terminated the interrogation. Mejia's interaction with the police officers was not taped and no contemporaneous notes were taken. However, Agent Naylor wrote a report of the interview two days later. For the duration of the interrogation Mejia had one

---

[2]Agent Naylor only spoke English and Detective Perez recalled translating Mejia's answers into English for Naylor.

arm handcuffed to a rail coming out from the wall, but there was no testimony or allegation that he was in any discomfort.

c. Indictment, Trial, and Appeal

Mejia was indicted on three counts, conspiracy to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), as well as 21 U.S.C. § 846; possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); and possession of a firearm in furtherance of a drug crime, in violation of 18 U.S.C. § 924(c). At trial and over Mejia's objection and unsuccessful motion to suppress, the government introduced the incriminating statements Mejia made during the interrogation. Also over Mejia's objection, the government introduced the recorded conversations between Tejada and the informants as well as the drug ledgers. The jury convicted Mejia on the conspiracy and gun charges but acquitted him on the charge of possession with intent to distribute. The district court sentenced him to the mandatory minimum of five years on each count, to run consecutively for a total of ten years.

Several weeks after the trial concluded, the government received a "trace report" on the pistol which indicated that it was originally purchased by a man from New Hampshire and had not been reported stolen. Mejia moved for a new trial based on this new

evidence and alleged discovery violations. The district court denied the motion following an evidentiary hearing.

## II. Discussion

a. The Motion to Suppress

Though Mejia raises numerous objections to his conviction and sentence, his appeal of the denial of the motion to suppress his incriminating statements is the only one of real consequence. We thus begin our analysis there.

We review the district court's findings on the denial of the suppression motion for clear error and review its legal determinations de novo. See United States v. Parker, 549 F.3d 5, 8 (1st Cir. 2008).

Mejia argues that the district court erred in denying his motion to suppress because the officers did not tell him what he was suspected of, did not "accurately interpret his rights into Spanish," and did not record the interrogation "in any fashion." Mejia argues that these three factors prevented the government from meeting its burden of proving that Mejia waived his rights knowingly and voluntarily.

Of course, Mejia is correct that any waiver of the Miranda rights to silence and access to an attorney must be both knowing and voluntary. See, e.g., United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir. 2006). However, the waiver need not be expressed. In North Carolina v. Butler, the Supreme Court

confirmed that, while courts must presume that a defendant did not waive his Miranda rights absent an express waiver, "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." 441 U.S. 369, 373 (1979). Thus, the Court explained, an implied waiver can be "inferred from the actions and words of the person interrogated." Id.[3] To make such an inference, we must examine the "totality of the circumstances surrounding the interrogation" to determine whether the defendant made both an "uncoerced choice" and had the "requisite level of comprehension" such that a court may properly conclude "that the Miranda rights have been waived." Moran v. Burbine, 475 U.S. 412, 421 (1986).

As we explained in Bui v. DiPaolo, there are "certain types of cases in which courts routinely conclude that a defendant who has professed an understanding of his right to remain silent has waived that right." 170 F.3d 232, 240 (1st Cir. 1999). These

_____

[3]In briefing and at oral argument the government urged the court to move beyond the Butler totality-of-the-circumstances test for waiver and instead extend the Supreme Court's holding in Davis v. United States, 512 U.S. 452 (1994), to the right to remain silent. The government asks that we conclude that any statement made by a "Mirandized" suspect who has not expressly invoked his right to remain silent is admissible. This issue is currently pending before the Supreme Court in Thompkins v. Berghuis, 547 F.3d 572 (6th Cir. 2008), cert. granted, 77 U.S.L.W. 3670 (U.S. Sept. 30, 2009) (No. 08-1470). We decline to extend our jurisprudence beyond Butler in this case because doing so is not mandated by our precedent, or current Supreme Court precedent, and most importantly, the case before us can be resolved under our existing totality-of-the-circumstances test.

include cases where "after receiving warnings and asserting (equivocally or unequivocally) a right to remain silent, [the defendant] spontaneously recommences the dialogue with his interviewers;" where "a defendant's incriminating statements were made either as part of a 'steady stream' of speech . . . or as part of a back-and-forth conversation with the police;" and where "having received Miranda warnings, a criminal defendant responds selectively to questions posed to him." Id. In Mejia's case, the factual scenario is comparable to these examples. He received Miranda warnings three times in his native language, twice orally and once in writing; he also attested that he understood his rights by initialing and signing the Miranda warning form. According to the district court's factual findings,[4] he then began responding to questions willingly and even offered to become an informant. The totality of the circumstances indicate that this was a voluntary conversation that Mejia undertook after having been fully advised of his rights. We agree with the district court that such a scenario fits comfortably within the doctrine of implied waiver.

Mejia's three objections do not undermine our conclusion. First, his argument that his waiver was not knowing because the

---

[4]Notwithstanding Mejia's argument in his reply brief, our review of the transcript from the suppression hearing confirms that the district court's findings as to Mejia's apparent responsiveness during the interrogation were well-grounded in the record and were not clearly erroneous. That Mejia was at times "evasive," according to the officers, does not undermine the voluntariness of the statement that he affirmatively chose to make.

"suspected crime" portion of the Miranda warning form was left blank is unconvincing given that Mejia's arrest and interrogation took place immediately after the drug transaction in the McDonald's parking lot. Under the circumstances, Mejia was plainly aware of the nature of the charges that might be filed against him. See 18 U.S.C. § 3501(b) (explaining factors court must consider in determining voluntariness, including whether the defendant "knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession").

Second, his argument that his Miranda rights were not accurately interpreted into Spanish is a red herring. Mejia does not contest the accuracy of the text of the written Miranda warning form itself; he only argues that Detective Perez was not formally trained in Spanish translation. The facts are that Mejia acknowledged that he could read Spanish, his rights were presented to him in writing in Spanish, he acknowledged understanding those rights, and Mejia does not question the accuracy of the form. Given this context, and without more, Detective Perez's Spanish-language abilities are not relevant to whether Mejia comprehended his rights as presented on the written form.

Third, Mejia's argument regarding the absence of contemporaneous notes of the interrogation or a video or tape recording is not properly before this court as it was not raised

-10-

below.[5]   See, e.g., United States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998) (waiver applies where "a defendant has failed altogether to make a suppression motion but also when, having made one, he has neglected to include the particular ground that he later seeks to argue").   We thus affirm the district court's denial of Mejia's motion to suppress the statements he made during the interrogation.

b. Mejia's Remaining Claims

Mejia raises several additional claims on appeal, none of which need detain us long.  First, he contests the admission by the district court of three additional pieces of evidence, the recorded conversations between Tejada and the two informants, the drug ledgers, and the testimony of Detective Perez as to the content of Mejia's incriminating statements.   As to the recorded conversations, which were admitted by the district court under a Petroziello analysis, we affirm, finding no abuse of discretion. Under Federal Rule of Evidence 801(d)(2)(E), the statements of a co-conspirator may be admitted against another co-conspirator if the statements were made during the course and in furtherance of the conspiracy.  Mejia's objection on appeal is that there was not sufficient evidence for the district court to determine that a conspiracy existed at the time the statements were made, as

---

[5]Mejia cross-examined the officers at the suppression hearing about the lack of contemporaneous documentation of the interrogation, but as the district court noted in its suppression order, Mejia neither raised this as a grounds for suppression in his memorandum to the court, nor did he claim that he did not make the statements attributed to him.

required by United States v. Petroziello, 548 F.2d 20, 23 (1st Cir. 1977). We disagree. The recorded conversations took place on December 11 and 12, while the drug deal and subsequent arrest occurred just a week later, on December 18. Significant evidence supports the district court's conclusion that the conspiracy existed at the time of the calls, including the drug ledgers in Mejia's handwriting that depicted an on-going, long-term business of cocaine sales; the high volume of phone calls (over 470 in a six week span leading up to the drug sale) between Tejada and Mejia; and Mejia's own incriminating statements.

As to the district court's admission of the drug ledgers, we similarly find no abuse of discretion. Mejia argues that the drug ledgers were more prejudicial than probative, violating Federal Rule of Evidence 403, and were admitted to show propensity, in violation of Federal Rule of Evidence 404(b). Mejia also argues that there was insufficient evidence to support the conclusion that the papers were indeed drug ledgers. We are unpersuaded. We have frequently allowed admission of just this sort of evidence -- notebooks and slips of paper containing names, quantities and amounts that correspond to the market rate for drugs -- for proof of the existence of a drug conspiracy. See, e.g., United States v. Casas, 356 F.3d 104, 125 (1st Cir. 2004). The testimony of the DEA agent laid a proper foundation for the admission of the evidence and the jury was free to infer that the evidence supported

the conspiracy charge against Mejia. In addition, the evidence was highly probative given Mejia's central defense, which was that he was "merely present" at the drug deal and otherwise uninvolved in the conspiracy. We thus affirm.

Mejia's final evidentiary objection is that the district court improperly allowed Detective Perez to testify as to the content of Mejia's incriminating statements given that Perez lacked formal training in English-Spanish translation. We again find no abuse of discretion. The district court permitted the defense to probe Detective Perez's translation ability at the suppression hearing and again at trial and allowed an expert witness for the defendant to testify as to the reliability and benefits of certified interpreters. Mejia's proof of Perez's supposed inadequacy is that at the suppression hearing Perez partially mistranslated one phrase (he translated "I am a suspect in the crime of . . . " to "I am suspicious of the crime of . . . ") and he lacked official training in translation. We find no abuse of discretion in admitting his testimony given that Perez testified that he is a native Spanish speaker (born in Colombia), regularly speaks both English and Spanish at home and work, and has served as a translator in several law enforcement contexts. See United States v. Gonzalez-Ramirez, 561 F.3d 22, 29 (1st Cir. 2009). In addition, "we see this argument as one more properly directed to

the weight of the evidence, not its admissibility." Id. We therefore affirm admission of the testimony.

Having affirmed the district court's evidentiary determinations, we address Mejia's sufficiency of the evidence claim.[6] Reviewing the evidence in the light most favorable to the verdict, see United States v. Baltas, 236 F.3d 27, 35 (1st Cir. 2001), and giving particular attention to Mejia's confession, his conduct at the drug deal, his frequent telephone contact with Tejada leading up to the deal, and the various recovered drug ledgers, we easily conclude that sufficient evidence supported Mejia's conviction on the conspiracy and gun charges.

We also deny Mejia's appeal of the denial of his motion for a new trial on the basis of the gun "trace report." The report was received by the government after the verdict was returned and was then turned over to defense counsel. The report showed that the gun in question was originally purchased by a New Hampshire man and had not been reported missing. Mejia argues that this was "newly discovered evidence" necessitating a new trial and, further, that the government suppressed evidence of the report in violation of Brady v. Maryland, 373 U.S. 83 (1963). The district court held an evidentiary hearing on the new trial motion and concluded that there was no Brady violation because the government did not receive

---

[6]Mejia's brief also seems to raise the district court's denial of his motion for acquittal and for a new trial on the same sufficiency grounds. We deny those grounds of appeal given our conclusion that sufficient evidence supported his conviction.

the report until after trial and, further, that the report was in no way exculpatory. Like the district court, we fail to see the relevance of the trace report to the charge that Mejia possessed the gun in furtherance of a drug crime. See United States v. Maldonado-Rivera, 489 F.3d 60, 66-67 (1st Cir. 2007) (explaining materiality requirement for new trial). After all, the gun was found in the car Mejia was riding in, had an obliterated serial number, and he confessed to having possessed the gun during the drug deal in order to protect Tejada. The "trace report" information regarding the original purchaser of the gun, without more, is not material or exculpatory given the charge. We therefore find no abuse of discretion and affirm denial of the new trial motion.

Finally, Mejia makes a sentencing argument regarding the "except" clause in 18 U.S.C. § 924(c)(1)(A), arguing that it was legal error for the district court to impose a consecutive five-year term for his gun conviction. Mejia concedes in his reply brief that a favorable result on this claim would require us to reverse this court's recent decision in United States v. Parker, 549 F.3d 5 (1st Cir. 2008), cert. denied, 129 S. Ct. 1688 (2009), something that a three-judge panel may not do. We therefore affirm his sentencing.

### III. Conclusion

For the above reasons, we **affirm** in all respects.

-15-