# United States Court of Appeals

## For the First Circuit

No. 22-1723

UNITED STATES,

Appellee,

v.

DANIEL DONALD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

Michael Pabian, for appellant.

Karen L. Eisenstadt, Assistant United States Attorney, with whom Rachael S. Rollins, United States Attorney, was on brief, for appellee.

October 16, 2023

**BARRON, Chief Judge**. This appeal concerns the challenge that Daniel Donald brings to his five 2021 convictions in the United States District Court for the District of Massachusetts on federal drug- and gun-related charges. He argues that the convictions must be vacated because the District Court failed to suppress incriminating statements that he made to law enforcement which he contends were obtained in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). We agree.

**I.**

**A.**

A federal grand jury returned the operative indictment in May 2019. It charged Donald with conspiracy to distribute and to possess with intent to distribute heroin, cocaine, cocaine base, and fentanyl in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute those drugs in violation of 21 U.S.C. § 841(a)(1) (Counts Two through Five); and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count Six). Before trial, Donald moved to suppress statements that he made to law enforcement immediately after his arrest, which occurred on November 30, 2017.

At the evidentiary hearing on the suppression motion, the government called only one witness -- Gary Morris, a Worcester, Massachusetts police officer who was a member of a U.S. Drug

Enforcement Agency Task Force ("Task Force") that had been investigating Donald for his suspected involvement in a drug-distribution operation. Officer Morris testified as follows.

On November 30, 2017, Task Force members executed federal search warrants in Worcester at a basement apartment and an adjacent, detached apartment, each of which Donald was renting. Although Donald did not live in either apartment, the Task Force suspected that he and two other individuals were using the apartments to run a drug-distribution operation.

On the day of the search, Donald arrived at the property where the two apartments were located accompanied by the two other individuals. Task Force members then detained the three of them, took them inside the basement apartment, and showed them the federal search warrants. One of the Task Force members thereafter recited Miranda warnings to the three individuals, including Donald, and presented them with a pre-printed form to sign titled "Miranda Warnings and Waiver."

The form included questions regarding whether the three individuals understood their Miranda rights as well as whether they wished to waive those rights and speak to investigators. Donald signed the form and did not place a checkmark on the line next to the statement that read: "Yes, I wish to talk to you now and waive my Fifth Amendment Right pursuant to Miranda."

Members of the Task Force proceeded to execute the search warrants. Inside the basement apartment, the Task Force members found two grinders of the type that can be used to grind and dilute drugs. In the detached apartment, the Task Force members found -- hidden in a wall -- a kilogram of cocaine, 345 grams of heroin, 80 grams of crack cocaine, 200 fentanyl pills, and a loaded firearm.

Officer Morris returned to the basement apartment and spoke with a DEA agent on the scene about the contraband that had been found in the detached apartment. At that point, Donald approached members of the Task Force and asked to speak with "the bald guy," which the Task Force members understood to be a reference to DEA Agent David DiTullio.

Officer Morris and Agent DiTullio took Donald to the bathroom of the basement apartment to speak privately. While there, Officer Morris "reminded" Donald of the Miranda warnings that Donald had been given. Donald "stated he wished to speak to" Task Force members, "asked what he can do to help himself," and stated that "he would provide information."[1] Agent DiTullio then

---

[1] Agent DiTullio later testified at trial that Donald did not at that time state the purpose of his request to speak. However, because Donald agrees that we must assess the record "in the light most favorable to the trial court ruling," United States v. Tibolt, 72 F.3d 965, 969 (1st Cir. 1995), we accept Officer Morris's testimony on this point for the purposes of the analysis below.

responded that any further conversation would have to occur at the Worcester Police Department ("WPD"). No further conversation with Donald occurred at the property.

Task Force members transported Donald to the WPD, where he affirmed that he still wished to speak to law enforcement. Donald was escorted to a room that was being both audio and video recorded. We recount below what the parties agree that recording establishes, noting any points of dispute along the way.

At the WPD, Officer Morris first reminded Donald of his Miranda rights by stating:

> I'm just gonna remind you that at the house I Mirandized you, read you your rights, you understood those right. . . . [Y]ou signed the form saying you understood them. . . . [E]verything's still the same and . . . you know if you wish to talk with us, if you want to stop at any time that's your right to do so.

After that, Agent DiTullio began speaking to Donald, stating:

> So as we talked before, . . . we're going down the road of the state charges tonight . . . this could have went another way, but you have some information that may help you with this whole thing. . . . And based on that, we're willing to talk to you . . . . So . . . we showed our hand of good faith by . . . you're not being charged federally tonight.

Soon thereafter, Agent DiTullio asked Donald, "You know what we got out of the side of the house, you know exactly what

was there, right?"  Donald then paused, put his hands in the air, and asked, "None of this can be used against me, can it?"

The parties do not agree about what happened next. Donald contends that Officer Morris answered the question that Donald had asked by saying, "No."  The government argues that the record supportably shows that Officer Morris did not provide that answer or, at least, that it supportably shows that he did not do so in any "intelligible" manner.

The parties do agree, however, that whether or not Officer Morris responded "No" to Donald's question, Agent DiTullio stated right after that question: "We have the stuff so it's, so, it is what it is . . . ."  The parties further agree as to the following sequence of events.

Donald interrupted Agent DiTullio and stated, "I understand so that's just, yes let's just . . . yes ok yes sure I assumed.  Just ok so go ahead, so you got what you got and what can I do to help myself out is what I want to get to."  Agent DiTullio responded to Donald's interruption by asking him to "tell [them] the story" because this was "the first step in cooperation" and that he should "tell [them] . . . what [he] kn[e]w was in the side of the house" because "[they] kn[e]w what was there."  Donald sighed and chuckled, after which Agent DiTullio said, "You gotta

- 6 -

trust us man. Like we told you, not 92% cooperation not 99, you gotta be on board and trust us."

Donald responded:

> I understand that, you know, but I'm trying to do what I can to get myself out of a bad situation. I know that I can guarantee to you guys, but on your end, you can't guarantee much of anything outside of the fact that you know, "you help us out, we'll do what we can." I don't want to put myself under the . . . gun giving statements . . . of what was there, so on and so forth, and it gets held against me in the court of law as evidence. You know what I'm saying? I know what . . . you guys got but you have to prove that it's mine. And we're not going to do that, okay, I'm just simply saying I know what . . . was there and I wanna do what I can to help myself out . . . .

Officer Morris stated at that point that the Task Force was "starting with" "keeping the charges at the state level" if Donald was "willing to cooperate," to which Donald replied, "I am." Donald then stated: "[H]ypothetically speaking, let's say there was a kilo of coke, a little over 300 grams of dopy and a little over 200 pills and whatever, hypothetically . . . and a gun, hypothetically." Agent DiTullio and Officer Morris then continued asking Donald questions about what was in the house.

Later, Officer Morris told Donald that for him to be able to form a "partnership" with members of the Task Force, Donald would have to "show something . . . of what [he could] do to help

[them]." Donald proceeded to give a full confession over the following twenty minutes regarding the nature and extent of his drug-dealing activities, the identity of his supplier, and how and when Donald might be able to arrange a meeting with that supplier so that officers could apprehend that supplier. Donald was charged the next day with the federal crimes set forth in the operative indictment.

**B.**

Prior to trial, Donald moved to suppress "all" the statements that he made "on November 30th, 2017." The District Court denied Donald's motion to suppress in a written order on May 23, 2019.

In doing so, the District Court rejected Donald's contention in his motion that Officer Morris responded "No" when Donald asked, "None of this can be used against me, can it?" The District Court found, based on its review of the recording of the interrogation, that Officer Morris did not so respond and that "[i]f there was a response . . . it was unintelligible."

Donald moved for reconsideration of this ruling, but the District Court denied the motion. The case then proceeded to trial.

During the cross-examination of Agent DiTullio, Donald's counsel played the recording and asked Agent DiTullio, "Did you

hear officer -- Task Officer Morris say any communication on the video?" Agent DiTullio responded, "He said 'no.'" Counsel then said, "Okay. So to the -- what you call to be a response, can any of this be used against me, you -- and after that statement was made, you heard Task Officer Morris say no?" Agent DiTullio responded, "Yes."

Based on the testimony from Agent DiTullio, Donald orally moved at the close of the government's case for the District Court to reconsider its suppression ruling. Donald did so again at the close of evidence.

The District Court denied both motions. The jury returned its verdict on October 29, 2021, and found Donald not guilty of the conspiracy charge (Count One) but guilty of the remaining charges (Counts Two through Six).

A few weeks later, on November 17, 2021, the District Court noted during a teleconference between the parties that it had some concerns about its suppression ruling due to Agent DiTullio's testimony. Donald subsequently filed his fourth motion for reconsideration of the denial of his suppression motion. The District Court heard argument on the matter on June 23, 2022. Donald addressed the District Court directly at that time and stated:

> I was under the impression that my statements
> were not going to be used against me for a

variety of reasons. . . . [T]he interrogation began under the premise where Agent DiTullio was representing to me that I was there to help myself out . . . .

Again, I attempt to make clear what my position is that I don't want to give statements about what was discovered in the hide and have those statements used against me in a court of law as evidence. . . . So, although I didn't feel comfortable speaking about the gun and the drugs, I didn't necessarily have a problem in the confession, because I was under the impression . . . I was there to help myself out, that my cooperation would result in me not being charged federally . . . .

Again, I took that interpretation to mean that my previously invoked rights were the same as everything else, and I could speak freely with them, because it was in the -- in a form of a cooperation.

So while there's no disagreement that I generally understood what my rights were, I do believe that in certain context on certain situations an individual can provide statements without the worry of having those statements come back to haunt them, such as, I don't know, maybe in a proffer session or something like that.

On July 29, 2022, the District Court issued a written order that denied Donald's fourth motion for reconsideration. The District Court concluded, as it had in its earlier rulings on the suppression motion, that Donald understood his Miranda rights and "knowingly, intelligently and voluntarily waived them, and agreed to talk to the agents."

The District Court also assessed whether statements that Donald made in the recording "constituted his free and voluntary

act." It concluded that, despite Agent DiTullio's testimony that he heard Officer Morris respond "No" to Donald's question, it still could not "determine that [Officer Morris] said 'No,'" mainly because Donald "did not wait for the agents to respond before he started to make statements, thereby undermining his contention that he only talked to the agents because of the assurance that his statements could not be used against him." The District Court did not stop there, however. It also concluded that, even if Officer Morris did say "No," it was "not clear whether [Officer Morris] was assuring Donald that his statements could not be used against him," and Donald "never asked for clarification" and never "again raise[d] the issue of whether anything he [said could] be used against him." The District Court further reasoned that Donald's conduct later in the interview, such as speaking in hypotheticals, "create[d] a strong inference that Donald understood anything he said could be used as evidence against him at trial." And, additionally, the District Court pointed to Donald's "significant criminal history" and "experience[] with the criminal justice system," as well as the fact that he initiated the interview, as reasons to think that Donald's responses were voluntary.

Thus, the District Court found "[b]ased on the totality of the circumstances . . . that Donald did not misunderstand his

rights" and "knew that any statements made to [Agent DiTullio] and [Officer Morris] could be used against him at trial." In addition, the District Court found in "making this determination" that "neither [Agent DiTullio] or [Officer Morris] made any assurance to Donald that his statements could not be used against him such that his statements were rendered involuntary or otherwise undermine the effectiveness of the Miranda warnings which had been given."

The judgments of conviction, per which Donald was sentenced to 192 months of imprisonment, were entered on September 14, 2022. Donald then filed this timely appeal.

**II.**

We begin with the portion of Donald's challenge to his convictions in which he contends that the government failed to show that he validly waived his Miranda rights before he made the statements that he seeks to suppress. One of his arguments in that regard rests on the contention that the District Court clearly erred in finding that Officer Morris did not respond "No" to Donald's question "None of this can be used against me, can it?" Donald reasons that any Miranda waiver that he supposedly made could not have been valid if that "waiver" came only after Officer Morris responded "No." Donald contends that any such waiver then would have been the result of law enforcement's misdescription of

the waiver's consequences and so could not have been knowingly, intelligently, and voluntarily made.

As we will explain, we conclude that the District Court clearly erred in finding that Officer Morris did not respond "No" and that, reviewing de novo, the "No" response rendered Donald's purported Miranda waiver invalid. Accordingly, we begin and end our analysis of Donald's challenge to his convictions on those grounds,[2] as we see no basis for concluding that the District Court's denial of Donald's suppression motion was harmless error.

**A.**

There are "two distinct dimensions," Moran v. Burbine, 475 U.S. 412, 421 (1986) (citing Edwards v. Arizona, 451 U.S. 477, 482 (1981)), to the inquiry into whether a Miranda waiver was "voluntarily, knowingly and intelligently" made. Miranda, 384 U.S. at 444, 475. First, "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421. Second, "the waiver must

---

[2] Donald separately argues that we must reverse the District Court's denial of his motion to suppress because the interrogators did not "scrupulously honor[]" his express invocation of his right to remain silent under Miranda, as required by Michigan v. Mosley, 423 U.S. 96, 103 (1975). And that is so, Donald argues, because the interrogators did not give him a fresh set of Miranda warnings at the outset of the interview. We do not address that contention because we conclude that the government cannot satisfy its burden to show that Donald validly waived his Miranda rights.

- 13 -

have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. Thus, "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

The government "bears the burden of showing the validity of the waiver by a preponderance of the evidence," and we must "start with a presumption that [Donald] did not waive his rights," United States v. Carpentino, 948 F.3d 10, 26 (1st Cir. 2020). To determine whether the government has met its burden to show that a valid waiver occurred, we review de novo "determinations on matters of law, including whether the totality of the circumstances demonstrate that the defendant's statement was knowing and voluntary." United States v. Rojas-Tapia, 446 F.3d 1, 3 (1st Cir. 2006). We review "subsidiary findings of fact" for clear error. Id.

**B.**

The parties agree that Donald expressly invoked his Miranda rights when he declined to speak to law enforcement after he was given the "Miranda Warnings and Waiver" form. There also is no dispute that Donald did not expressly waive those rights at

any time thereafter.  The question, then, is whether he impliedly did so.

Donald conceded at oral argument that if he impliedly did so before he asked, "None of this can be used against me, can it?" then he would likely have no claim under Miranda, given our ruling in United States v. Bezanson-Perkins, 390 F.3d 34, 40 (1st Cir. 2004).  But the government does not contend in its briefing to us that the asserted implied waiver occurred before Donald asked that question or even before Officer Morris responded to it, insofar as Officer Morris did so respond.  Indeed, the government states in its briefing to us that Donald "waived his Miranda rights by participating in the interview that he himself had requested" (emphasis added).  And we do not understand the government in so stating to be suggesting that Donald's mere asking of the question that preceded the supposed "No" response from Officer Morris amounted to Donald "participating in the interview" that followed.

Nonetheless, the government did contend for the first time at oral argument that Donald waived his Miranda rights when he first indicated (after having invoked Miranda) that he wanted to speak to law enforcement and that he then waived those rights again at the WPD at some point before Donald argues that Task Force Officer Morris answered "No."  But we see no merit to this late-breaking contention.

- 15 -

As an initial matter, we note that we do not understand the District Court to have found that Donald's waiver of his Miranda rights occurred either before Donald asked the question to Officer Morris that precipitated the claimed "No" response or before the moment at which Donald contends that Officer Morris responded "No." For, in denying Donald's first motion to suppress, the District Court did not determine that the waiver occurred at the property where the searches were executed based solely on Donald having reinitiated communication with law enforcement after having expressly asserted his Miranda rights. Rather, the District Court found that there had been a waiver, not only based on the fact that Donald was reminded of Miranda at the outset of the interview at the WPD, but also based on the fact that the recording of the interview "reflects a free-flowing exchange initiated by the Defendant with the agents." Similarly, in the denial of Donald's motion for reconsideration of the denial of the suppression motion, the District Court rested its determination that there had been a valid waiver on the course of the "free-flowing exchange" as a whole -- that is, on statements that Donald made throughout the exchange and on the fact that law enforcement made no assurances to him during the exchange that could "undermine the effectiveness of the Miranda warnings which he had been given."

In any event, our precedents preclude us from agreeing with the government's belated contention about how early the claimed waiver occurred. The record does show that Donald initiated contact with Task Force members at the property where the searches were executed after he had expressly invoked his Miranda rights. But we have explained that "[a] suspect does not waive his Miranda rights merely by initiating investigation-related communication with law enforcement officers after previously asserting his right to counsel." Carpentino, 948 F.3d at 25. And we see no basis in the record for concluding that, after having expressly invoked his Miranda rights, Donald did more than initiate investigation-related communication with law enforcement prior to making the statements that followed what Donald contends was the "No" response from Officer Morris.

In Carpentino, for example, we held that the defendant had not waived his Miranda rights, after having expressly invoked them, by waving from his cell to get a guard's attention, asking to talk to the troopers who had previously interviewed him, returning to an interview room, and responding once there to a trooper's statement that the troopers would "have to re-Mirandize [him] because [they] brought [him] back in" by stating: "How much, would, uhm, the maximum time be for something like this?" Id. at 18. Instead, we concluded that the waiver had occurred based on

- 17 -

what happened "[a]fter the defendant initiated the second phase of the interview." Id. at 26 (emphasis added).

The government is right that in United States v. Mejia, 600 F.3d 12 (1st Cir. 2010), we stated that there are "certain types of cases in which courts routinely conclude that a defendant who has professed an understanding of his right to remain silent has waived that right" and that these include cases where "after receiving warnings and asserting . . . a right to remain silent, [the defendant] spontaneously recommences the dialogue with his interviewers," id. at 17. But Mejia is fully consistent with Carpentino in determining the validity of asserted waiver by focusing on what had occurred over the course of the defendant's "dialogue" with officers, and not simply on what had occurred at the moment at which the defendant chose to initiate communication with law enforcement. Id. Indeed, in concluding that there was a valid Miranda waiver in Mejia, we emphasized that the defendant, after having been given the Miranda warnings three times and having signed a form that indicated that he understood those rights, "began responding to questions willingly and even offered to become an informant." Id. at 18. We explained that this sequence of events indicated that "this was a voluntary conversation that Mejia undertook after having been fully advised of his rights." Id.

## C.

Although we have concluded that Donald did not waive his Miranda rights as early as the government belatedly asserted at oral argument that he had, there is still the question as to whether Officer Morris responded "No." In asserting that any claimed waiver that was made was not a valid one, Donald contends that Officer Morris did make that response and thus that there was no valid waiver. The District Court found, however, that Officer Morris did not so respond or, at least, that the answer Officer Morris gave was "unintelligible."

Our review of this factual finding by the District Court is for clear error, which means we must "defer to the [D]istrict [C]ourt's finding[] unless 'the record, read as a whole, gives rise to a strong, unyielding belief that a mistake has been made.'" United States v. Negron-Sostre, 790 F.3d 295, 301 (1st Cir. 2015) (quoting United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011)). As the District Court pointed out, the moment in question features Officer Morris, Donald, and Agent DiTullio all speaking and interrupting each other in quick succession, sometimes speaking simultaneously. Indeed, at just the moment that Officer Morris -- on Donald's account -- says "No," Agent DiTullio is also speaking. And, whether due to microphone volume levels or the volumes of their actual voices, both Agent DiTullio's and Donald's

- 19 -

voices appear to be louder in the recording than Officer Morris's voice, particularly in instances when multiple people are speaking simultaneously. So, this was not a situation in which the District Court was confronted with just a simple exchange between two parties to decipher.

Nonetheless, our review of the recording still leads us to conclude that it is clear that Officer Morris did say "No" at just the moment that Donald argues that he did. Moreover, there was no finding by the District Court, insofar as Officer Morris did intelligibly respond "No," that Donald did not hear the statement. For these reasons, we conclude that Donald has satisfied his burden under the clear-error standard in contending that Officer Morris responded "No" in an intelligible manner when Donald asked, "None of this can be used against me, can it?" Cf. Scott v. Harris, 550 U.S. 372, 378–81 (2007) (granting summary judgment for petitioner on the ground that "[r]espondent's version of events is so utterly discredited by the [videotape recording of the car chase at issue] that no reasonable jury could have believed him" and commenting that the "Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape"); see also United States v. Reinberg, 62 F.4th 266, 269 (6th Cir. 2023) (concluding that the district court's finding "wasn't clearly erroneous" based on a

review of the video because "[a]t best, the video is partially ambiguous" and "the district court's interpretation of the video was the most plausible").

**D.**

Having shown that no waiver occurred before Officer Morris said "No" and that it was clear error for the District Court to find that Morris did not make that response, Donald still must show one thing more to succeed on his challenge to the denial of his suppression motion. He must show that the government cannot meet its burden to show that his purported waiver following that "No" response was made "voluntarily, knowingly and intelligently." Moran, 475 U.S. at 421 (quoting Miranda, 384 U.S. at 444, 475).

To show that a Miranda waiver was voluntary, the government must show that it "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. To show that the waiver was knowing, the government must show that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," meaning that the government must show that the defendant not only "knew he could stand mute and request a lawyer" but also "that he was aware of the [government's] intention to use his statements to secure a conviction[.]" Id. at 421-22 (emphasis added).

Donald contends that the government cannot meet its burden to show that his waiver was knowing in light of the "No" response because of the confusion that response could have created about the effect under Miranda of his speaking to law enforcement about what was found at the property where the searches were executed. He contends that Hart v. Att'y Gen. of Fla., 323 F.3d 884 (11th Cir. 2003), supports his contention.

There, the Eleventh Circuit looked to statements made by investigators even after the defendant had already signed an explicit Miranda waiver -- such as that "honesty wouldn't hurt him," as well as that a "con" of his getting counsel was that counsel might advise him not to respond to some of the officers' questions -- and concluded that because those statements contradicted the earlier Miranda warnings, they rendered the defendant's waiver "not voluntary, knowing, and intelligent." Id. at 894-95. In the same way, Donald contends, he could have reasonably interpreted Officer Morris's "No" response as an assurance that none of his statements could be used against him and thus as a statement that contradicted the earlier Miranda warnings in a way that rendered any subsequent waiver of Donald's Miranda rights invalid.

The government responds that the "No" response, even if made, is not determinative. That is so in part, the government

contends, because of the nature of the question that Donald asked before that response was given.

According to the government, the District Court "implicitly found that [Donald's question] was referring to some kind of separate promise relating to his cooperation, not his Miranda rights" (emphasis added). The government thus reasons that there is no basis for concluding that the "No" response, even if made, could have caused any confusion on Donald's part about what Miranda itself provided, given that the District Court found that response would have at most concerned the nature of a separate cooperation agreement that Donald may have thought he had. We are not persuaded.

For starters, we note that even if the District Court found, and did not clearly err in so finding, that Donald's question was referring to a separate cooperation agreement, we must still decide whether, in consequence of the "No" response, the government has met its burden to establish that Donald knowingly, intelligently, and voluntarily waived his Miranda rights. But insofar as the government means to argue that the District Court made a finding of fact that the question did not reflect any confusion on Donald's part about what the effect under Miranda would be of his entering into a conversation with law enforcement about what was found at the property, such that our

review of the District Court's assessment of whether he was confused in that respect is only for clear error, we reject the contention.

The assessment of what Donald ultimately understood about Miranda -- as well as what he understood would be the consequences of waiving its protection -- presents a question of law, not fact. And that is because the question concerns whether, based on the totality of the circumstances, the government has shown that Donald did knowingly waive his Miranda rights by speaking to law enforcement as he did following the "No" response. See Rojas-Tapia, 446 F.3d at 3. As a result, we review that question de novo and not for clear error.

Indeed, we do not understand the District Court itself to have been operating on a different understanding in ruling as it did. Even if the District Court found the question that Donald asked pertained to a cooperation agreement, the District Court explicitly referred to the remainder of its assessment of whether the waiver was knowing, intelligent, and voluntary, and its resulting conclusions, as being "[b]ased" on a "totality of the circumstances."

That said, the government does also argue that, even on de novo review, the waiver was valid, given the totality of the circumstances. And so we must address that contention as well.

In making this argument, the government rightly points to aspects of the record that show that this case is somewhat distinct from Hart, 323 F.3d 884. After all, unlike in that case, there seems to be no dispute that Donald had a basic understanding of Miranda. As the government argues, Donald testified at the reconsideration hearing that "there's no disagreement that [he] generally understood what [his] rights were" or that he believed that "in certain context[s] . . . an individual can provide statements without the worry of having those statements come back to haunt them, such as . . . in a proffer session." Building off those features of the record, the government further contends that, as a result, even if Officer Morris did say "No," that response would not merit vacating Donald's convictions because a de novo review of the totality of the circumstances reveals that the response did not actually cause Donald to become confused about the existence of his right to remain silent under Miranda. Thus, the government argues, Donald's contention that there was no valid Miranda waiver fails and that he, at most, would have had a non-Miranda-based due-process claim -- which he has not brought -- that his confession was obtained through "coercive official tactics," see Bezanson-Perkins, 390 F.3d at 40.

But, based on our de novo review of the record, we cannot conclude that the government has shown that Donald's familiarity

with the criminal-justice system was sufficiently nuanced that it would educate him about whether, under Miranda, statements he made while cooperating in this matter were immunized, even though the record does show that he generally understood that statements that he made would not be immunized. Thus, consistent with Hart, we conclude from a de novo review of the record that the government has failed to show that, given the totality of the circumstances, the "No" response did not cause Donald to misunderstand the protection that he was foregoing under Miranda by speaking as he did when he did.

To that point, Donald stated -- after he received the "No" response but before he spoke in hypotheticals -- that he did not want to "put [him]self under the . . . gun giving statements" that would "get[] held against [him] in the court of law as evidence." True, that statement could show, as the government contends, that Donald was not under the impression that, under Miranda, he could speak with impunity. But, it equally could show that Donald was simply confused about how freely he could speak in this setting under Miranda without giving up its protections, given the "No" response he had received. Indeed, even the District Court observed at trial based on this statement by Donald that "[i]t's almost as if [Donald] thought . . . that he could say whatever he wanted with impunity because he had invoked his [rights] before."

- 26 -

Thus, while we appreciate the District Court's evident care in considering this fact-dependent <u>Miranda</u> issue, we cannot conclude -- given the equivocal nature of the record on the key point -- that the government has satisfied its burden to show that Donald validly waived his <u>Miranda</u> rights. And, as this error was not harmless, we agree with Donald that none of his convictions can stand.

### III.

For the reasons stated above, the convictions are **<u>vacated</u>**, and the case is **<u>remanded</u>** for further proceedings consistent with this opinion.